NOTICE
Decision filed 07/11/19. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2019 IL App (5th) 160027

NO. 5-16-0027

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 14-CF-1161 |
| | ) | |
| DAVID W. RYDER, | ) | Honorable |
| | ) | Jan V. Fiss, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court, with opinion.
Presiding Justice Overstreet and Justice Boie concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, David W. Ryder, appeals his convictions and sentences, in the circuit court of St. Clair County, for the offenses of predatory criminal sexual assault, victim under age 13 (count I and count II), and aggravated criminal sexual abuse, victim under age 13 (count III and count IV). For the following reasons, we affirm.

¶ 2                                    FACTS

¶ 3    The facts necessary to our disposition of this appeal follow. On September 5, 2014, the defendant was indicted by the grand jury of St. Clair County for the criminal offenses of predatory criminal sexual assault, victim under age 13 (count I and count II), and aggravated criminal sexual abuse, victim under age 13 (count III and count IV). Count I alleged that between June 1, 2014, and August 3, 2014, the defendant, who was born in 1972, "placed his penis inside the vagina of [a] female minor with a date of birth [in February 2002]." Count II alleged that

during the same time frame, the defendant "placed his finger inside the vagina" of the same female victim. Count III alleged that between June 1, 2013, and August 31, 2013, the defendant "placed his penis in the hand of the [same female minor victim] for the purpose of the sexual gratification of the defendant." Count IV alleged that between June 1, 2014, and August 13, 2014, the defendant "placed his mouth on the vaginal area of the female minor for the purpose of the sexual gratification of the defendant."

¶ 4      The defendant's jury trial commenced on November 17, 2015. Before allowing examination of the potential jurors by the parties, the trial judge conducted extensive *voir dire* himself. During the trial judge's questioning, he asked the potential jurors if any of them had "any close relatives employed by law enforcement?" Potential juror Harris indicated that he did, and additional questioning of him, by the trial judge, followed. Thereafter, the trial judge stated, "Anyone else?" Potential juror Pensoneau raised her hand and stated, "Yes, sir." When the trial judge asked her who she knew, the following colloquy occurred:

"JUROR PENSONEAU: Scott Weymouth.

THE COURT: And who is that?

JUROR PENSONEAU: He is a St. Clair County—I don't know actually his actual long title.

THE COURT: Is he an officer, a police officer?

JUROR PENSONEAU: He is crimes and detectives or something of that nature. Scott Weymouth.

THE COURT: Okay.

JUROR PENSONEAU: He's been there for—

THE COURT: Either of the parties know who we're referring to here?

MS. DALAN [(ASSISTANT STATE'S ATTORNEY)]: Yes, Your Honor.

JUROR PENSONEAU: He's my brother.

THE COURT: Is he in the Sheriff's Department?

MS. DALAN: Yes, sir, he is.

JUROR PENSONEAU: Do you know what his title is?

THE COURT: Okay. Anything about that relationship that would affect your ability—

JUROR PENSONEAU: Not at all—

THE COURT: —to serve? Okay. Anybody else?"

Additional potential jurors then discussed their relationships with law enforcement officers. The trial judge, at that time, did not dismiss any of the potential jurors based upon their answers.

¶ 5    Subsequently, when the trial judge had finished the rest of his extensive questioning, both the State and the defendant, separately, were permitted to question the potential jurors. Neither party followed up with Pensoneau about her relationship with her brother, Scott Weymouth. Outside the presence of the potential jurors, the parties then completed the jury selection process. Assistant State's Attorney (ASA) Dalan noted that "one of the jurors indicated that she knew Scott Weymouth," and that "[a]lthough he's not a witness in the case, he does appear in one of the video interviews." She added, "And I thought [defense counsel] probably already knew that and remembered it." Defense counsel then asked which juror "knew Weymouth?" ASA Dalan told him it was Pensoneau, who was in "seat number 19," and defense counsel responded, "Uh-huh. Got it. Okay." The selection process then continued. Neither party challenged Pensoneau for cause. When defense counsel used his final peremptory challenge against the potential juror in seat No. 18, ASA Dalan stated, "you know it's seven, don't you? Seven peremptories." Defense counsel responded, "Correct." Thereafter, the following colloquy occurred:

"[DEFENSE COUNSEL]: We're also going to excuse No. 19.

THE COURT: Wait a minute. You only got seven bullets, right?

MS. DALAN: Right.

THE COURT: So if you already got seven—

[DEFENSE COUNSEL]: Right.

THE COURT: Well, then you don't have any bullets left.

MS. LEAHY [(ASSISTANT STATE'S ATTORNEY)]: Is 19 *** your seventh by your count or is 19 your—

[DEFENSE COUNSEL]: No, I take it back, Your Honor. We're not going to challenge 19."

Thereafter, defense counsel attempted to use a peremptory against the potential juror in seat No. 23, and was again reminded that he had used all seven of his peremptories. Both the juror in seat No. 19 (Pensoneau), and the juror in seat No. 23, were seated on the jury.

¶ 6    The following morning, November 18, 2015, opening statements were given and testimony in the case began. The first witness to testify was Frank Bennett, an investigator with the St. Clair County Sheriff's Department. Bennett testified that after he learned of the victim's allegations against the defendant, Bennett facilitated an interview of the victim at the Child Advocacy Center in St. Clair County. After observing that interview, Bennett interviewed the defendant at the sheriff's department. The interview was audio and video recorded. After explaining the defendant's *Miranda* rights to the defendant, and going over a preprinted video statement checklist with the defendant, Bennett began to question the defendant, in an interview that lasted approximately one hour. Bennett testified that the defendant "originally denied everything, said that nothing happened." Bennett testified that eventually, the defendant stated that "he was in the mood for sex and his wife wasn't in the mood." The defendant saw the victim asleep with the defendant's daughter in the defendant's daughter's bedroom, and because the victim's "hand was off to the side," the defendant "walked up and placed his penis in her hand and slid it back and forth a couple times." The jury was then permitted to watch the interview, which was authenticated by Bennett, admitted into evidence, and marked as "First Interview with

Investigator Bennett." We have reviewed the interview, which is included as part of the record on appeal. We note that at approximately 23 minutes into the 49-minute interview (as explained above, the original interview was a little over one hour, but it was redacted to 49 minutes for trial, and it is the redacted version that is included in the record on appeal), Captain Weymouth entered the interview room, introduced himself to the defendant and shook the defendant's hand, and remained for the rest of the questioning, in which he participated.

¶ 7     On cross-examination, Bennett agreed that while interviewing the defendant, Bennett used investigative techniques he had been trained to use, and he reiterated that the defendant initially denied any inappropriate contact with the victim. He agreed that at one point the defendant told Bennett that the defendant was scared, and that Bennett told the defendant that the allegations were "not the crime of the century." Bennett agreed that during the interview he encouraged the defendant to take responsibility for the defendant's actions. On redirect examination, Bennett testified that based upon his many years as an investigator, he found it "common that suspects will initially deny conduct, criminal conduct, before admitting it." He agreed that the defendant denied wrongdoing many times during the interview, before admitting to "the conduct with the penis in the hand." He agreed that Captain Weymouth had asked the defendant if the defendant "had been a victim himself as a younger man," which the defendant denied.

¶ 8     The next witness to testify was Thomas Trice, who testified that he had recently retired from the St. Clair County Sheriff's Department after 21.5 years. Trice testified that following Bennett's initial interview with the defendant, Trice conducted a second interview the next day, which also was audio and video recorded. Prior to the interview, the defendant executed a second waiver of his *Miranda* rights. Trice testified that during his interview with the defendant, the defendant "explained" to Trice that the defendant inserted one of his fingers into the victim's vagina, "and that he actually used spit to lubricate her vagina, and that he also took his penis and

placed it on her hand." He testified that the defendant denied that he licked the victim's vagina but admitted "[t]hat he placed his mouth down there and that he actually spit on her vagina just to lubricate it." The jury was then permitted to watch the interview, which was authenticated by Trice and admitted into evidence. On cross-examination, Trice conceded that the defendant initially had denied all misconduct to Bennett.

¶ 9 Dr. Linda Shaw of the St. Louis University School of Medicine Department of Pediatrics testified she is board certified in child abuse pediatrics and that she had interviewed and examined the victim in this case several weeks after the alleged incidents of abuse. Dr. Shaw testified that the results of her physical examination of the victim did not reveal "hymenal injury" but that the results were not inconsistent with the victim's report of the defendant's "penis going into her vaginal area" because, under circumstances such as those alleged in this case, Dr. Shaw would "rarely find anything that [she could] detect on examination *** if it hasn't been within the last day or couple of days." She testified that a delay in reporting abuse is "certainly a very common phenomena." On cross-examination, Dr. Shaw conceded that a lack of injury could also be consistent with a lack of penetration.

¶ 10 The State next called Bennett back to the witness stand. Bennett testified that after Trice interviewed the defendant, Bennett conducted another interview with the defendant, one day after Bennett's first interview with the defendant. Bennett testified that during Bennett's second interview with the defendant, which also was audio and video recorded, the defendant admitted "there was some penetration with his finger" and "[b]asically he confirmed everything that [the victim] said except for the penetration with the penis." Bennett testified that the defendant continued to deny that he had penetrated the victim with his penis and continued to deny licking her vagina but told Bennett "he had put his mouth close to her vagina and he had spit on it." The jury was then permitted to watch this interview as well, which was authenticated by Bennett and admitted into evidence. On cross-examination, Bennett agreed that he used investigative

techniques such as minimizing the severity of the defendant's behavior in an effort to get the defendant to trust him, and he agreed that he used "leading" questions to "confirm" the defendant's answers.

¶ 11    Kevin Kocurek, an investigator with the St. Clair County Sheriff's Department, testified that he was working as a patrol deputy on August 3, 2014, when a friend of the victim contacted the police to report a possible criminal sexual assault. Kocurek testified that he interviewed the victim, who told him that a man later identified as the defendant "had offered her money to either her touch his penis or him to touch her vagina." The victim also told Kocurek that on one occasion the victim awoke to find the defendant's "penis in her hand and he was rubbing her hand up and down on his penis." On another occasion, the victim awoke to find the defendant "on top of her, licking her vagina," and thereafter the defendant "climbed on top of her and placed his penis inside her vagina." Kocurek testified that before calling the police, the victim had called "the rape hotline" and had been told to write a note about what had happened to her; the victim gave Kocurek the three-page letter she had written, which Kocurek included with his report. The victim told Kocurek the incidents "had happened over the past two years," and that "the last one had just happened like a couple weeks earlier." All of the abuse occurred at the defendant's home.

¶ 12    The victim was the next witness to testify. She testified that she was 13 years old at the time of the trial, that the defendant previously lived "catty corner" to the victim's father, and that previously she often visited the defendant's home, including overnight, to "watch his kids" or while her mother was at work and she did not want to be at home alone. She testified that one night she was asleep in a double bed with one of the defendant's daughters, who was five years younger than the victim. The bed was in a corner, and the defendant's daughter was sleeping "against the wall," while the victim was on the "outside" of the bed. The victim, who was sleeping on her stomach, awoke to find her left hand touching the defendant's penis. The victim

pretended still to be asleep, while the defendant's penis moved "[b]ack and forth" in a vertical way. After the defendant left the room, the victim pretended to be asleep "a little bit longer," then went to the bathroom, where she felt something liquid in her hand. The victim washed her hands, then went back to bed. The defendant's daughter had been sleeping the entire time and was still asleep. The victim testified that she did not tell anyone about the incident because she was scared, and was afraid she would get in trouble because she did not stop the defendant while the incident was happening.

¶ 13    The victim testified that approximately a year later, a second incident occurred. Prior to both the first and second incidents, the defendant made the victim uncomfortable several times by asking her to "touch" him and offering her money or gifts to touch him. The victim always told him no. After the first incident, but before the second, the defendant continued to ask the victim to touch him. The defendant also sometimes "watched or stared at" the victim. The second incident occurred in the same bedroom as the first, again at night and while the victim and the defendant's daughter were asleep in the defendant's daughter's double bed. The victim, who was again sleeping on her stomach on the outside part of the bed while the defendant's daughter again slept against the wall, awoke to feel the room's fans blowing on her "butt" and to feel the defendant "pulling [her] butt cheeks apart." She next felt the defendant "licking" her vagina. She continued to pretend she was asleep. The victim testified that she next "felt like something was going inside of" her. She believed it was the defendant's penis because she could feel both of his hands on her back. She did not yell or make any noise even though she "hurt." She testified that the bed started shaking and that the defendant's daughter woke up. She testified that the defendant told his daughter, who the victim described as sitting up in the bed and looking "half awake," to go back to sleep. The victim testified that she thought the defendant might have pushed his daughter's shoulder down and that the daughter "rolled back over and went to sleep." The defendant then "got off of" the victim and left the room. The victim remained in the room

for about 10 minutes, to make sure the defendant was gone, then went to the bathroom and washed her hands. When she awoke the next morning, she had a "weird feeling" of being worried and scared of the defendant, so she and the defendant's daughter went outside to play, instead of staying inside. She was afraid to tell her mother what happened because she thought her mother would not believe her and would tell the defendant. She eventually reported the defendant because she was afraid of what he might do to his daughters. The victim testified that she knew what the defendant did was wrong and that she should have told someone earlier.

¶ 14 The victim then testified about her interview with the police and at the Child Advocacy Center, as well as the examination at the hospital. She authenticated the letter she had written about what happened to her, then read it to the jury. In the letter, she described incidents of the defendant offering her money if she "touched him or gave him a blow job," unzipping his pants and then touching her leg even after she repeatedly pushed his hand away, as well as descriptions of the two incidents she had previously testified about. Her descriptions in the letter of those two incidents were consistent with her trial testimony about the two incidents. In the letter, she also described incidents when the defendant would "grab" her "butt." She testified that the defendant told her not to tell anyone because no one would believe her.

¶ 15 On cross-examination, the victim testified that the letter she wrote was in her own words and that no one told her what to write. With regard to the two incidents in the defendant's daughter's bed, the victim testified consistently with her direct examination testimony. She agreed that after the two incidents, she once texted the defendant, "Hey, I see you, we just drove past your work," when she was with her mother in her mother's car, and that no one forced her to send the text to the defendant. On redirect examination, the victim testified that she had no memory of sending the text to the defendant, that her brother sometimes used her phone, and that she may have sent the text because "I say 'I see you' to everyone."

¶ 16    The following day, November 19, 2015, Lindsey Reichert, a forensic interviewer, testified that she currently worked at the Sangamon County Child Advocacy Center but previously worked at the St. Clair County Child Advocacy Center. She testified that she interviewed the victim on August 12, 2014, and that the interview was audio and video recorded. The jury watched the interview, which was authenticated by Reichert and admitted into evidence. The videotaped interview is included in the record on appeal. The victim's description in the interview of the abuse she suffered at the hands of the defendant is consistent with her courtroom testimony about the abuse. Thereafter, Reichert testified that the victim was 12 years old at the time of the interview and that, prior to beginning the interview, Reichert told the victim that they "could only talk about the truth," that it was okay for the victim to tell Reichert that the victim did not understand a question, it was okay to answer that she did not know the answer to a question if that was the case, and that if Reichert repeated anything back to the victim incorrectly, it was okay for the victim to correct Reichert. She asked initial questions to build rapport with the victim and did not ask "any leading or suggestive questions." Reichert testified that she believed the victim told her "everything, it didn't seem like she held back anything."

¶ 17    After Reichert's testimony, the State rested its case, the defendant moved for a directed verdict based on a purported insufficiency of evidence, and the trial judge denied the defendant's motion. The defendant then began his case by calling Jason Robertson, an investigator with the St. Clair County Sheriff's Department. Robertson testified that, pursuant to a search warrant obtained by the St. Clair County State's Attorney's Office, he did a forensic download of the defendant's cell phone and did not find anything "odd or unusual" or that he thought was of "evidentiary value in this case." Robertson testified that a message had been located that read, "Hey. I see we just drove past your work."

¶ 18    The next witness to testify was the defendant's oldest daughter, who testified that she was eight years old at the time of the trial. She testified that she lived with her father, mother, and

sister and was once friends with the victim but no longer was. She testified that she liked to sleep with the light on in her bedroom because she was "scared of ghosts" and that she also slept with the television set on. She testified that when the victim slept with her in her bedroom, she slept on the outside of the bed, and the victim slept by the wall. She did not remember ever waking up to find her father in the bedroom. The victim never told her about the defendant abusing the victim. The defendant's daughter testified that the victim had once touched her in "the wrong way," but she did not remember when it happened, where it happened, or whether it happened more than once. When asked where she was touched by the victim, the defendant's daughter testified, "My private," and testified it was under her clothes.

¶ 19    On cross-examination, the defendant's daughter testified that each time the victim slept in her bed, the victim slept "against the wall." She testified that she did not remember telling an interviewer at the Child Advocacy Center that she slept against the wall and the victim slept on the outside of the bed. She testified she also did not remember telling the interviewer that someone at her school, either in kindergarten or first grade, gave her "bad touches." She agreed she told the interviewer nobody else gave her bad touches but reiterated that the victim had touched her. She testified that she told her mom or dad but did not remember when. When asked why she was present to testify, the defendant's daughter testified, "To save my dad." She continued to be unable to remember when she told her mom or dad that the victim touched her, even when prompted with a possible time frame. When asked if the victim was a "cover hog" when they slept together, she testified, "No," and testified that she did not remember telling the interviewer at the Child Advocacy Center that the victim was. On redirect examination, the defendant's daughter testified that she was telling the truth and that no one had directed her what to say prior to her testimony.

¶ 20    The defendant was the next witness to testify. He testified that he did not tell his daughter what to say when she testified. He testified that the victim was a "cover hog" and that he would

check on her and his daughter "several times" a night to make sure they both had covers on them. He agreed that his daughter sleeps with the lights and television on in her room and did so when the victim spent the night. He denied that he ever placed his penis in the victim's hand. He testified that his daughter told him that the victim "touched her, and sometimes when she did it, it hurt and it hurt for her to pee." He denied that he ever grabbed or squeezed the victim's "butt" or slapped "her on the backside" but testified, "there was patting. You're at your computer and your kid comes up and sits on your leg. That's all that was done." He testified he did the same thing with his own kids and did not touch the victim differently. He denied offering the victim money to give him a "blow job" but testified that he may have used the term "blow job" in front of the victim "because the way I frequently talk to my wife and my [adult] niece. It's possible."

¶ 21 The defendant denied unzipping his pants when with the victim but testified that he "did touch her leg" to move her out of his truck. The defendant was asked, "Did you ever put your hand on her leg and then she moved it away?" He testified, "That was the same night." He was asked if he knew what the arrangements were for "who slept next to the wall and who slept away from the wall." The defendant testified, "There was no arrangements. I'd go in there and they was how they was, that's how they stayed." He denied ever (1) getting into bed with the victim and his daughter, (2) touching the victim's vagina, (3) putting his mouth on or near her vagina, (4) spitting on her vagina, (5) touching her breasts, or (6) making his daughter's bed "rock back and forth or up and down." With regard to what the defendant called the night "in question," the defendant testified that he went into his daughter's bedroom twice, both times to fix the covers for his daughter and the victim. When asked if "anything" in the victim's three-page letter was true, the defendant testified, "No." He authenticated photographs of his daughter's bedroom with no lights on, which he testified were significant because the victim had testified "that the lights were off but she could still see that it was me." He described his daughter's bedroom with the lights off as "Black. Dark."

¶ 22    The defendant testified that when he spoke with the police about the allegations against him, he was "[t]ired and hungry" following a long day of working and going on an out-of-town errand with a friend. He did not believe Bennett would believe what the defendant told him "one way or the other." He testified that he admitted to placing the victim's hand on his penis because he wanted to go home that night and thought "the only way I'm going to get out of here then is if I tell you what you want to hear." He testified he had never been interrogated by detectives before. He testified that he would not admit to "penetrating" the victim. He testified that he was unable to sleep while held in a cell that night because of "the clanging of the doors, people snoring, people yelling, people getting loud." Although offered breakfast the next morning, the defendant "chose not to eat it." The defendant testified that when Trice interviewed him that morning, the defendant made his admissions to Trice because the defendant "wanted to go home." He denied that he ever "insert[ed] his finger into" the victim, despite what he told Trice. He testified that he was not "thinking clearly," had not slept, and wanted to go home.

¶ 23    On cross-examination, the defendant alleged that the recordings of his interviews with the investigators "could have" been altered by the police before they were turned over to the state's attorney's office. He conceded that he was not mistreated by the police in any way and was even allowed to smoke, despite the fact that was not permitted in the county jail. He agreed that he was 41 years old, with a long work history as a truck driver, when interviewed by the police. The following colloquy then occurred:

> "MS. DALAN: So you're 41 years old when officers interview you, and they don't threaten you, they don't mistreat you, and they do not promise you anything; and yet, you admit to sexual conduct with a 12-year-old under your roof just because you wanted to go home?

> THE DEFENDANT: Well, long day, tired. My days consist of—as an analogy, you sit in a traffic jam for five hours, how tired are you going to be when you get home

or if you've got to go to the grocery store; you sit in traffic for five hours and then you've got to go to the grocery store and you sit in traffic five hours more, you're tired and you want to go home.

MS. DALAN: But nothing in the videotape shows an officer saying you will go home if you tell us what we want to hear.

THE DEFENDANT: It was—no, nothing in the tapes, you're correct."

After further questioning, the defendant admitted that he had signed *Miranda* waivers before speaking with each officer, understood the waivers and the fact that he did not have to talk to the officers, and agreed that Bennett treated him "with respect" and that Trice was "friendly" to him. He then agreed that he had made each admission contained in the recordings, without being forced by anyone to do so, and that he had apologized and said "[i]t should have never have happened" as well as saying it was "a big mistake." On redirect examination, he testified that he apologized, despite not having done anything wrong, "just to go home."

¶ 24 After the defendant testified, the defense rested. The State then called Carolyn Hubler, the executive director of, and a certified forensic interviewer for, the St. Clair County Child Advocacy Center, in rebuttal. Hubler testified that she interviewed the defendant's oldest daughter on August 13, 2014, because the daughter might have been "at risk of harm" in light of the allegations against her father, the defendant. Hubler testified that the defendant's daughter told Hubler that the victim in this case was a "cover hog" and that someone in kindergarten or first grade in the defendant's daughter's school had touched her in her private area but that no one else had touched her in that area. Hubler testified that the defendant's daughter told Hubler that when the victim slept with the defendant's daughter in bed, the victim "would sleep on the outside of the bed and she would sleep by the wall." Defense counsel declined to cross-examine Hubler.

¶ 25    On the following morning, November 20, 2015, closing arguments were delivered and the jury was instructed. According to docket minutes prepared by the court reporter and included in the record on appeal, the jury began to deliberate at 10:49 a.m. Thereafter, the jury sent a note to the trial judge that stated, "Can we watch 1st interview of David[?]" At 12:12 p.m., the trial judge convened the parties, outside the presence of the jury, and at 12:14 p.m., decided to bring the jurors in to ask if they wished to watch the entire "40-something-minute" interview or just part of it. When asked, multiple jurors responded, in various ways, and the trial judge ultimately ruled, in the presence of the State and defense counsel, "what we'll do, we will have the clerk and the bailiff present, and after you've watched as much as you feel you wanted to watch, notify them, and then we'll just terminate it at the point." Subsequently, a juror indicated that he or she (the name and gender of the juror is not clear from the record) was "going to go to the restroom." The trial judge responded, "Absolutely. Take a comfort break. And then we'll set this up and we'll watch—we'll turn this on for you, and we will leave." Defense counsel then indicated he wished "to take up something with the [c]ourt," and at 12:20 p.m., the parties and the trial judge retired to chambers. There, defense counsel expressed a reluctance to allow the jury to watch only part of the recording, as he believed that might be prejudicial to his client. The State noted that the jury had already watched the entire recording, during the trial, and knew everything that was on it. The trial judge ruled that he would "let them watch from the beginning until they get through the admission—to the admission. And then if they say they don't need to see any more, leave that up to them." Thereafter, ASA Leahy interjected, stating "They're already watching it." Defense counsel noted that the point of the discussion in chambers was to decide "what they should see." The trial judge noted that a juror had gone "to the john" and thereafter indicated that he did not know the jury was already watching the recording.

¶ 26    At 12:25 p.m., a discussion between the trial judge, the parties, and the jury was held back in the open courtroom. The trial judge asked, "Have you been watching this from the very beginning?" The following colloquy then occurred:

"JUROR: Yes.

JUROR: Yes.

THE COURT: Okay. So you've seen that part. So we're going to show this through the part that you're looking for, which is the admission. Is that what you called it? I don't know what term to use, but—

JUROR: Where he started talking and—and admitting to stuff.

THE COURT: Yeah.

JUROR: Basically.

THE COURT: That's where I heard the word. Okay. So you've watched this from the very beginning, right? All right. So we're going to go up to that—that's what you want to see. You want to go—so we're going to go from the very beginning, which you've already done some of it, and to the part that you want to see. And then you—you tell the clerk and the bailiff that you've seen as much as you want to see, okay?

JUROR: Okay.

THE COURT: All right. So we're all on the same page on this. Any additions or corrections from either side?

MS. DALAN: No, sir.

[DEFENSE COUNSEL]: No, Your Honor.

THE COURT: Okay. That's what you're going to do. So you'll still have your clerk and bailiff here."

¶ 27    At 12:26 p.m., the court recessed. At 1:16 p.m., the court reconvened in chambers to address a second note from the jurors, wherein they asked for clarification regarding the charge

of "penis *in* viginia [*sic*]" (emphasis in original) as opposed to the definition of "penetration = contact." With the agreement of the parties, the trial judge sent the jurors a note that stated, "The law is contained in the instructions you have already received. Please continue to deliberate." Thereafter, the jurors indicated that they had "screwed" up one of the verdict forms, and later the jurors sent an additional note, asking for a "smoke break." With the agreement of the parties, the trial judge gave the jurors a smoke break and provided them with an entirely new and clean set of verdict forms.

¶ 28    At 2:48 p.m., almost exactly four hours after deliberations began, the jury found the defendant guilty of all four counts with which he had been charged. A date was set for a sentencing hearing, and in the interim, the defendant's bond was revoked. Subsequently, the defendant filed a motion for a new trial, which was denied. He was sentenced to two consecutive 10-year terms of imprisonment on counts I and II, and to two 3-year terms of imprisonment for counts III and IV, with the latter terms to be concurrent to one another and consecutive to the terms imposed on counts I and II. This timely appeal followed.

¶ 29                              ANALYSIS

¶ 30    On appeal, the defendant contends (1) the trial judge should have *sua sponte* removed juror Pensoneau for cause, because she was the sister of one of the law enforcement officers who interviewed the defendant and who appeared in a videotape of that interview that was played for the jury at the defendant's trial; (2) in the alternative, trial counsel was ineffective for failing to ask that Pensoneau be removed for cause and for failing to request an additional peremptory challenge to use to remove Pensoneau; and (3) plain error warranting reversal occurred because the jurors were allowed to view video evidence during their deliberations in the presence of a clerk and the bailiff.

¶ 31    The defendant first contends the trial judge should have *sua sponte* removed Pensoneau for cause because she was the sister of one of the law enforcement officers, Captain Weymouth,

who interviewed the defendant and who appeared in a videotape of that interview that was played for the jury at the defendant's trial. The defendant posits that "Pensoneau's relationship with Weymouth automatically disqualified her from serving on the jury." The defendant argues that "under the doctrine of implied bias," as developed by the federal judiciary, Pensoneau could not be rehabilitated, and therefore her statement that she could be fair and impartial does not change the fact that she was disqualified to serve on the jury, notwithstanding the fact that she was not statutorily disqualified under Illinois case law. The defendant urges us to examine his claim under the plain error rule because no objection was made at trial.

¶ 32    In response, the State contends the defendant has failed to meet his burden of persuasion and therefore has failed to meet the requirements for plain error review in this case. However, the State cites no case law in support of this argument and does not put forward an argument to show that the defendant is not entitled to plain error review. Instead, the State puts forward an argument as to why the defendant's claim should fail on its merits. For this reason, we conclude the State has forfeited any objection to plain error review (see Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (argument must contain the contentions of the party, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in a reply brief, in oral argument, or in a petition for a rehearing)), and we, like the State, will examine and address the defendant's claim on its merits.[1]

¶ 33    First, the defendant is incorrect in his assertion that Pensoneau was "automatically disqualified" as a juror because of her relationship to Weymouth. The defendant cites no case that holds that there currently exists such automatic disqualification under the implied bias doctrine, and we are not aware of any cases that stand for that proposition either. To the contrary, as the federal judiciary has continued to explore the parameters of the implied bias doctrine, the

---

[1]Forfeiture notwithstanding, the Illinois Supreme Court has held that in a case such as this one, plain error review is available because the issue raised is one that affects a defendant's constitutional right to a fair trial. *People v. Metcalfe*, 202 Ill. 2d 544, 551-52 (2002).

Seventh Circuit Court of Appeals has considered and rejected the argument that an implied bias claim cannot be waived. *United States v. Brazelton*, 557 F.3d 750, 753-55 (7th Cir. 2009). Specifically, the *Brazelton* court ruled that the defendant's "contention that implied bias cannot be waived, is wrong." *Id.* at 754. Thereafter, the *Brazelton* court explicitly and unequivocally held that a defendant may waive an implied bias claim—a holding that is directly contrary to any notion that there currently exists some kind of automatic disqualification under the doctrine. See *id.* at 755 ("In this circuit, there is no ambiguity on the question whether the right to an impartial jury can be waived. We have held that '[t]he Sixth Amendment right to an impartial jury, like any constitutional right, may be waived.' [Citations.] Brazelton's on-the-record decision to pass up not one, but two opportunities to ask that Juror Number Four be struck for cause [under the implied bias doctrine] was a waiver.").

¶ 34    Second, the defendant is incorrect in his assertion that the trial judge had a duty to *sua sponte* remove Pensoneau for cause. The Illinois Supreme Court has expressly rejected such a duty. In *People v. Metcalfe*, 202 Ill. 2d 544, 555 (2002), the court stated that it "decline[d] to impose a duty upon a trial court to *sua sponte* excuse a juror for cause in the absence of a defendant's challenge for cause or exercise of a peremptory challenge." The court reasoned that a rule imposing such a duty "would allow a defendant 'two bites of the apple' " because a defendant could sit back and allow a questionable juror to be on the defendant's jury and then, following conviction, "could claim that the trial court erred in failing to strike the juror *sua sponte*." *Id.* at 555-56. Moreover, if the trial judge did strike a juror *sua sponte*, and a conviction followed, the defendant could claim the trial judge erred in his *sua sponte* strike. *Id.* at 556. The Illinois Supreme Court looked with approval to a decision of the Missouri Court of Appeals that pointed out that an adversarial process that requires contemporaneous objections to the qualifications of jurors is appropriate because it minimizes the incentive a party might have to attempt to game the jury selection process with silence at trial, followed by a posttrial attack.

*Id.* (citing *State v. Wright*, 30 S.W.3d 906, 914 (Mo. Ct. App. 2000)); see also, *e.g.*, *People v. Bowman*, 325 Ill. App. 3d 411, 426 (2001) ("It would be a bad idea to allow defendants to accept a questionable juror, proceed to trial, then, when things turn out badly, claim entitlement to reversal because that juror voted to convict. By not giving the court the opportunity to prevent or correct errors at trial, a lawyer would gain the advantage of obtaining a reversal through an intentional failure to act ***."). The Illinois Supreme Court concluded that although a trial judge "certainly has the discretion to remove a juror *sua sponte* for cause," there nevertheless exists no "duty to do so." *Id.* at 557.

¶ 35    In light of the fact that there currently exists no automatic disqualification under the implied bias doctrine, and that, to the contrary, claims thereunder may be waived by a party, and in light of the fact that a trial judge in Illinois has no duty to *sua sponte* excuse a juror for cause in the absence of a challenge from a party, we conclude that there exists no basis in this case to find that the trial judge erred when he failed to *sua sponte* remove Pensoneau for cause. As in *Brazelton*, in this case the defendant was given the opportunity to object to the juror in question under the implied bias doctrine, but instead of bringing to the trial judge such a challenge, the defendant waived the opportunity to do so when defense counsel declined to in any way challenge Pensoneau for cause or even, for that matter, to question her about her relationship with Weymouth. Under such circumstances, we find no error on the part of the trial judge.

¶ 36    This, however, does not end our inquiry, because, as noted above, the defendant next contends, in the alternative, that his trial counsel was ineffective for failing to ask that Pensoneau be removed for cause under the implied bias doctrine and for failing to request an additional peremptory challenge to use to remove Pensoneau. As framed by the above discussion, the key question with regard to this issue on appeal, therefore, is whether the waiver of the implied bias doctrine that occurred in this case constituted ineffective assistance of counsel. To succeed on a claim of ineffective assistance of counsel, "a defendant must show both that his counsel's

performance was so seriously deficient as to fall below an objective standard of reasonableness and that the deficient performance so prejudiced defendant as to deny him a fair trial." *Metcalfe*, 202 Ill. 2d at 561. When we examine whether counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness, our "judicial scrutiny of a counsel's performance is highly deferential," requiring a defendant to "overcome a strong presumption that the challenged actions of counsel were the product of sound trial strategy." *Id.* Moreover, "defense counsel's conduct during jury *voir dire* involves matters of trial strategy that generally are not subject to scrutiny under" an ineffective assistance of counsel claim. *Id.* at 562.

¶ 37 This high level of deference notwithstanding, we conclude that even if we assume, *arguendo*, that trial counsel would have been successful had he pursued an implied bias claim or requested an additional peremptory challenge, and further assume *arguendo* that his failure to attempt to pursue those remedies rendered his performance at trial so seriously deficient as to fall below an objective standard of reasonableness, the defendant's ineffective assistance of counsel claim still fails. That is the case because to show the prejudice required to prevail on such a claim, "a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* As the defendant correctly notes, the "defendant's burden is not to show that a different verdict was likely in the absence of counsel's shortcomings." *People v. Lefler*, 294 Ill. App. 3d 305, 312 (1998). Instead, we ask if, in the presence of the alleged shortcomings, the defendant "received a fair trial," which in this context means "a trial resulting in a verdict worthy of confidence." *Id.*

¶ 38 In this case, our comprehensive review of the evidence presented at the defendant's trial leads us to conclude that the defendant did in fact receive a fair trial that resulted in a verdict worthy of confidence, and that there is no reasonable probability that, but for trial counsel's alleged shortcomings, the result of the trial would have been different. The evidence adduced at the defendant's trial is described in detail above. Of significance to the question of whether the

defendant is able to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, the defendant claims that (1) there was conflicting testimony as to whether the victim slept on the outside of the bed or against the wall, (2) there was no physical evidence of vaginal penetration, and (3) the defendant's partial admissions do "not necessarily mean the evidence was not closely balanced," because the defendant initially denied wrongdoing and only made his admissions about some of the allegations because he was hungry and tired, wanted to go home, and did not think the police would believe him anyway.

¶ 39    With regard to the first point, the victim testified clearly and unequivocally about where she was sleeping when each of the two incidents in the defendant's daughter's bedroom occurred. Her courtroom testimony was consistent with her interview at the Child Advocacy Center. The victim never wavered in her recounting of where she was when each incident happened nor was her testimony in any way implausible. The defendant's testimony at trial did not conflict with that of the victim. He was asked if he knew what the arrangements were for "who slept next to the wall and who slept away from the wall" and testified, "There was no arrangements. I'd go in there and they was how they was, that's how they stayed." The only "conflicting testimony" was the testimony of the defendant's daughter, who was eight years old when she testified. She testified that when the victim slept with her in her bedroom, she slept on the outside of the bed, and the victim slept by the wall. She testified that she did not remember telling an interviewer at the Child Advocacy Center that she slept against the wall and the victim slept on the outside of the bed. However, the defendant's daughter's testimony was substantially impeached, on this and many other points, by the testimony of Carolyn Hubler, the executive director of, and a certified forensic interviewer for, the St. Clair County Child Advocacy Center. Hubler testified that she interviewed the defendant's daughter, who told Hubler, *inter alia*, that when the victim slept with the defendant's daughter in bed, the victim "would sleep on the

outside of the bed and she would sleep by the wall." At trial, defense counsel declined to cross-examine Hubler. Moreover, when asked why she was present to testify, the defendant's daughter testified, "To save my dad." In light of all of the foregoing, the "conflicting testimony" advanced by the defendant does not undermine our confidence in the jury's verdict.

¶ 40    With regard to the second point—that there was no physical evidence of vaginal penetration—Dr. Linda Shaw of the St. Louis University School of Medicine Department of Pediatrics testified she interviewed and examined the victim several weeks after the alleged incidents of abuse. Dr. Shaw testified that the results of her physical examination of the victim did not reveal "hymenal injury" but that the results were not inconsistent with the victim's report of the defendant's "penis going into her vaginal area" because, under circumstances such as those alleged in this case, Dr. Shaw would "rarely find anything that [she could] detect on examination *** if it hasn't been within the last day or couple of days." She testified that a delay in reporting abuse is "certainly a very common phenomena." On cross-examination, Dr. Shaw conceded that a lack of injury could also be consistent with a lack of penetration. In light of the timing of Dr. Shaw's examination of the victim, and in light of Dr. Shaw's unequivocal testimony that she would "rarely find anything that [she could] detect on examination *** if it hasn't been within the last day or couple of days," the accuracy of which is not disputed by the defendant on appeal, the lack of physical evidence in this case does not undermine our confidence in the jury's verdict.

¶ 41    With regard to the third point, the defendant posits that his admissions may have been false confessions. Notably, the defendant does not present a claim that he is actually innocent, or that his confessions were in fact false ones, and does not present any case law to support such a claim. Accordingly, the defendant has forfeited any such claim in this appeal. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are

forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Moreover, the defendant attempted to undermine his own confessions with these same arguments at trial, which gave the jury the opportunity to fully consider his position on this issue. Clearly, the jury rejected the defendant's belated objections to his questioning by police, and found his testimony unconvincing.

¶ 42     As recounted above, at trial the defendant conceded that he was not mistreated by the police in any way and was even allowed to smoke, despite the fact that was not permitted in the county jail. He agreed that he was 41 years old, with a long work history as a truck driver, when interviewed by the police. The following colloquy then occurred:

> "MS. DALAN: So you're 41 years old when officers interview you, and they don't threaten you, they don't mistreat you, and they do not promise you anything; and yet, you admit to sexual conduct with a 12-year-old under your roof just because you wanted to go home?

> THE DEFENDANT: Well, long day, tired. My days consist of—as an analogy, you sit in a traffic jam for five hours, how tired are you going to be when you get home or if you've got to go to the grocery store; you sit in traffic for five hours and then you've got to go to the grocery store and you sit in traffic five hours more, you're tired and you want to go home.

> MS. DALAN: But nothing in the videotape shows an officer saying you will go home if you tell us what we want to hear.

> THE DEFENDANT: It was—no, nothing in the tapes, you're correct."

¶ 43     After further questioning, the defendant admitted that he had signed *Miranda* waivers before speaking with each officer, that he understood the waivers and the fact that he did not have to talk to the officers, and agreed that Bennett treated him "with respect" and that Trice was "friendly" to him. He then agreed that he had made each admission contained in the recordings,

without being forced by anyone to do so, and that he had apologized and said "[i]t should have never have happened" as well as saying it was "a big mistake." All of the admissions made by the defendant at trial are supported by the other evidence presented to the jury; in fact, the videotaped recordings of the defendant's three interviews with the police clearly show, on repeated occasions, that the officers involved made sure the defendant did not feel as if he was being mistreated, made sure that his comfort needs were met, and that the officers did not coerce, intimidate, or cajole the defendant in any way. Each of the interviews is cordial and laid back, with the officers repeatedly telling the defendant they want him to tell them only the truth and not to speculate or tell them things that are untrue or that he is not sure about. In addition, Bennett testified at trial that based upon his many years as an investigator, he found it "common that suspects will initially deny conduct, criminal conduct, before admitting it." The defendant's attempt at trial to retrospectively claim the recordings of his interviews with the investigators "could have" been altered by the police before they were turned over to the state's attorney's office is no more convincing to us than it was to the jury. The defendant has presented nothing on appeal to undermine our confidence in the jury's verdict.

¶ 44     In sum, as stated above, our comprehensive review of the evidence presented at the defendant's trial leads us to conclude that the defendant did in fact receive a fair trial that resulted in a verdict worthy of confidence and that there is no reasonable probability that, but for trial counsel's alleged shortcomings, the result of the trial would have been different. Accordingly, the defendant's ineffective assistance of counsel claim fails. See, *e.g.*, *Lefler*, 294 Ill. App. 3d at 312.

¶ 45     The defendant's final contention on appeal is that plain error warranting reversal occurred because the jurors were allowed to view video evidence during their deliberations in the presence of a clerk and the bailiff. The State argues that plain error review is not available in this case because there was no objection at trial and general rules of forfeiture apply to the defendant's

claim. Plain error review "is a narrow and limited exception" to general rules of forfeiture. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The first step in determining whether plain error review is available is determining whether "a clear or obvious error occurred." *Id.* The defendant bears the burden of persuasion. *Id.*

¶ 46    In this case, the defendant concedes that the trial judge admonished the jurors not to deliberate during the viewing of the video evidence, but the defendant nevertheless posits that error occurred because conducting the viewing in the presence of a clerk and bailiff "allowed for the possible influence on the jury by the clerk and the bailiff through anything from an improper comment to negative body language." In support of this proposition, the defendant cites, as "much like this case," the case of *People v. Henderson*, 2017 IL App (3d) 150550. Therein, as the defendant notes, our colleagues in the Third District concluded that "clear error" occurred where the jury viewed video evidence outside the presence of the parties but in the presence of two nonjurors: a bailiff and an employee of the state's attorney's office. *Id.* ¶ 46. The court noted that the nonjurors "could have frowned at a piece of evidence or scoffed at defendant's testimony." *Id.* The defendant in this case contends his situation is even worse because (1) the jurors began to watch the video evidence before the trial judge had even decided how much of it they would be permitted to see, (2) not all the jurors were present when the viewing began, and (3) "the jurors were left alone with two non-jurors with nobody present to protect the interest of [the defendant] having his case decided without any outside influence."

¶ 47    However, we agree with the State that there is a key factual difference that makes *Henderson* inapposite to this case: whereas in *Henderson*, the jury watched the video evidence in the presence of an employee of the state's attorney's office—a clear representative of one of the parties to the case, with a stake in the outcome of the case—in this case, the jury watched the video evidence in the presence of two neutral nonjurors—a clerk and a bailiff—neither of whom was a representative of one of the parties, and neither of whom had a stake in the outcome of the

case. Of additional significance, in this case the trial judge announced, in front of defense counsel and the State, the trial judge's intention to have only the clerk and bailiff present during the viewing, and despite having multiple opportunities to do so, as described in detail in our recitation of facts, above, defense counsel did not object to, and instead appeared to agree to, this procedure. Indeed, after announcing the procedure that was to occur, the trial judge specifically asked "Any additions or corrections from either side?" After the State said no, defense counsel replied, "No, Your Honor."

¶ 48    On appeal, the defendant does not contend defense counsel's failure to object to this procedure, or defense counsel's agreement to it, constituted ineffective assistance of counsel. Accordingly, the defendant has forfeited consideration of any such claim. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Forfeiture notwithstanding, any such ineffective assistance of counsel claim would be without merit and would fail for the same reason the defendant's above ineffective assistance of counsel claim fails: because the defendant cannot demonstrate that he was prejudiced by the alleged ineffective assistance of counsel. Moreover, to the extent defense counsel agreed to this procedure by choosing not to take issue with it despite being given an explicit opportunity to do so, it is axiomatic that the doctrine of invited error prohibits a defendant who agrees to proceed in a certain manner from challenging that manner on appeal. See, *e.g.*, *People v. Spencer*, 2014 IL App (1st) 130020, ¶ 26.

¶ 49    We also agree with the State that no error occurred with regard to the other two allegations made by the defendant: the fact that the jury began to watch before the trial judge had decided what, if anything, they would be permitted to see, and the allegation that not all the jurors were present when the viewing began. First, we note that once the trial judge learned that

the jury had begun to watch the videotape of the defendant's first interview with Bennett, the trial judge ensured—by repeatedly questioning the jurors, as described in detail above—that they had begun the videotape at the beginning, in conformance with the ruling he had made outside of their presence. The trial judge correctly determined that the jury had not acted in a manner that was inconsistent with his ruling and presumably he was ready and able to address the matter if they had acted inconsistently with his ruling. Because they had not done so, there was no additional action needed from the trial judge and no error or injustice occurred.

¶ 50     Second, the trial judge made it clear, in chambers, that he was aware someone had gone "to the john" after he told the jurors they could use the restroom. It is inconceivable, and not supported by anything in the record, to believe that the trial judge would not have made a record if all the jurors were not present when he thereafter addressed them in the open courtroom or if he had reason to believe that the juror or jurors who had used the restroom had not returned by the time the viewing of the videotape began. Moreover, we agree with the State that the fact that the jury continued to deliberate and sent out additional notes after viewing the first videotaped interview militates against the notion that something untoward happened with regard to that viewing. Certainly, if one or more jurors had not been present for the viewing, they would have alerted the trial judge to that fact. This jury, after all, showed no reluctance to send notes to the trial judge when they believed it was warranted, including for something as simple as a "smoke break." We find no error in this case and conclude that in light of the foregoing facts, the trial judge did not abuse his discretion in his handling of the jury's viewing of the videotape of the defendant's first interview with Bennett. See, *e.g.*, *People v. McKinley*, 2017 IL App (3d) 140752, ¶ 22 (mode and manner in which trial judge allows jury to review evidence such as videotape "falls directly within the scope of" trial judge's "inherent authority to manage" his or her courtroom). Because no error occurred, the defendant's argument for review under principles

of plain error fails. See, *e.g.*, *Hillier*, 237 Ill. 2d at 545 (first step in determining whether plain error review is available is determining whether "a clear or obvious error occurred").

¶ 51    Furthermore, we agree with our colleagues in the Fourth District that, even if allowing a jury to view video evidence in the presence of the parties or neutral[2] nonjurors were found to be error, it "does not rise to the level of structural error under the [second prong of the] plain-error doctrine." *People v. Matthews*, 2017 IL App (4th) 150911, ¶¶ 36, 43. As explained above, the defendant in this case concedes that he did not preserve this claim of error and that it can be reviewed, if at all, only under principles of plain error. For the reasons discussed above, we do not believe the evidence in this case was closely balanced. Accordingly, the defendant has failed to satisfy either of the two instances in which plain error review is available. See, *e.g.*, *id.* ¶¶ 16-17 (two instances allowing plain error review are " '(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error[,] and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process' " (quoting *People v. Belknap*, 2014 IL 117094, ¶ 48); under both prongs, burden of persuasion belongs to defendant).

¶ 52                                  CONCLUSION

¶ 53    For the foregoing reasons, we affirm the defendant's convictions and sentences.

¶ 54    Affirmed.

---

[2]We reiterate that both this case and *Matthews* are distinguishable from *Henderson*, 2017 IL App (3d) 150550, because they do not involve a situation, as did *Henderson*, where a representative of only one of the parties was present as a nonjuror, a situation that we agree with the *Henderson* court is much more susceptible to improper influence and constitutes error.

2019 IL App (5th) 160027

NO. 5-16-0027

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | St. Clair County. |
| v. | ) ) | No. 14-CF-1161 |
| DAVID W. RYDER, | ) ) | Honorable Jan V. Fiss, |
| Defendant-Appellant. | ) | Judge, presiding. |

---

**Opinion Filed:**       July 11, 2019

---

**Justices:**       Honorable James R. Moore, J.

Honorable David K. Overstreet, P.J., and
Honorable Mark M. Boie, J.
Concur

---

**Attorneys
for
Appellant**

James E. Chadd, State Appellate Defender, Jacqueline L. Bullard,
Deputy Defender, John M. McCarthy, Assistant Appellate Defender,
Office of the State Appellate Defender, Fourth Judicial District, 400 West
Monroe Street, Suite 303, P.O. Box 5240, Springfield, IL 62705-5240

---

**Attorneys
for
Appellee**

Hon. Brendan F. Kelly, State's Attorney, St. Clair County Courthouse,
10 Public Square, Belleville, IL 62220; Patrick Delfino, Director, Thomas
D. Arado, Deputy Director, Chelsea E. Kasten, Staff Attorney, Office of
the State's Attorneys Appellate Prosecutor, 628 Columbus Street, Suite
300, Ottawa, IL 61350

---