# Illinois Official Reports

## Appellate Court

---

### *People v. Henderson*, 2017 IL App (3d) 150550

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AARON D. HENDERSON, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-15-0550 |
| Filed | November 30, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 13-CF-1089; the Hon. Michael F. Meersman, Judge, presiding. |
| Judgment | Reversed; cause remanded. |
| Counsel on Appeal | Michael J. Pelletier, Peter A. Carusona, and Kelly M. Taylor, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>John L. McGehee, State's Attorney, of Rock Island (Patrick Delfino, Lawrence M. Bauer, and Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Justices Carter and O'Brien concurred in the judgment and opinion. |

¶ 1 Defendant, Aaron D. Henderson, appeals from his conviction for first degree murder and his subsequent 40 year prison sentence. Specifically, he argues that the trial court (1) committed reversible error when it conducted *ex parte* communications with the jury during deliberations, (2) committed reversible error when it allowed the jury to observe audio and video evidence in the courtroom during deliberations in the presence of only a representative of the State's Attorney's office, (3) failed to conduct a preliminary inquiry into defendant's *pro se* allegations of ineffective assistance of counsel, and (4) abused its discretion in sentencing him to 40 years' imprisonment. We reverse and remand for a new trial.

¶ 2                                                           FACTS

¶ 3 In December 2013, defendant was charged, in relevant part, by information with first degree murder (720 ILCS 5/9-1(a)(3) (West 2012)) for the death of Derek James Jackson based on an accountability theory. Specifically, the charge alleged that defendant, while acting with another for whose conduct he was legally responsible for, during the attempted commission of robbery, shot Jackson with a firearm causing his death. The following month, defendant was charged with a second count of first degree murder with a firearm (720 ILCS 5/9-1(a)(2) (West 2012); 730 ILCS 5/5-8-1(d)(iii) (West 2012)), for personally discharging the firearm that killed Jackson.

¶ 4 Defendant's trial took place over the course of four days in March 2015 during which the following evidence was presented.

¶ 5 Alyson Schippers testified that she was Jackson's girlfriend. Over her lunch hour on December 17, 2013, she was with Jackson, Jackson's three-year-old son Remy, Kameron Bolden, and defendant, whom she knew by the nickname "Dewy." She explained that Jackson and defendant were "good friends" and that defendant was at Jackson's house "a lot." While on her lunch break, Schippers overheard defendant and Jackson talking about Jackson purchasing a gun from defendant and someone else. Schippers did not find this unusual because Jackson had guns at his house and went to the shooting range. Jackson later picked her up from work, and she, Jackson, and Remy returned to Jackson's home where they spent the night. Schippers stated that the three of them woke up the next morning around 10:30 to 11 a.m. Jackson had money lain out on the dresser, which Schippers assumed was for the purchase of the gun. She was getting Remy dressed while Jackson was getting ready for work when the telephone rang. According to Schippers, Jackson answered the phone and then told her that Dewy was on his way. Jackson asked her to turn on the music, and he went downstairs. She plugged her phone into the sound system. Jackson's house was also equipped with an alarm system, and she heard a beep upstairs which indicated the front door to the house had opened.

¶ 6 Approximately 5 to 10 minutes later, Schippers heard a gunshot. She went downstairs to see what happened and saw Jackson lying on the ground as defendant, who was wearing a black hoodie, was leaned over Jackson rifling through his pockets. Schippers was scared so she went back upstairs and "took [her] phone off of the music" but then she "plugged it back in" because she did not want "them" to come upstairs. Shortly thereafter, she saw two people "running up the street." Their back was to her and all she could see was that they "had dark clothes on, pants and shirt." Schippers ran downstairs to check on Jackson and saw that he

had been shot and was unresponsive. She called 911. A recording of the 911 call was published to the jury. During the call, Schippers tells the operator that "Dewey" and "Kam" shot Jackson. Schippers further testified that Jackson's cell phone was never located nor was the cash he had set out to purchase the gun.

¶ 7    Nicholas Pauley, a police officer with the city of Rock Island, testified that he responded to the scene of the shooting. Upon arriving at the scene, he entered the house and saw that personnel from the Rock Island fire department were treating Jackson's apparent head wound. Pauley then secured the scene. He located three spent shell casings in the vicinity, one in the kitchen and two in the dining room, which he marked with a piece of paper. Pauley was also present during the execution of a search warrant at defendant's residence. During that search, he collected a pair of black jeans and other clothing.

¶ 8    Ellen Chapman, a forensic scientist with the Illinois State Police, testified that she tested the pockets of the black jeans collected from defendant's residence. According to Chapman, the right front pocket of the jeans tested positive for gunshot residue. She further testified that the gunshot particles could be the result of being in the same environment as the discharged firearm.

¶ 9    Garrett Alderson, a criminalist with the Rock Island police department, testified that he was dispatched to the scene of the shooting to take photographs and collect evidence. He collected four shell casings and two bullets from the scene. The next day, he returned to the residence and collected a third bullet from the residence and a fourth bullet from Jackson's body that was recovered during autopsy. Alderson stated the shell casings collected from the scene were 40-caliber TulAmmo Smith & Wesson casings. He also participated in the execution of the search warrant at defendant's residence. At that residence, Alderson collected some of defendant's clothing. He also took possession of money that had been seized from defendant and turned over to the Rock Island police department. Alderson found a potential blood stain on the money but no latent fingerprints. He then returned the money to a detective to enter into evidence.

¶ 10    Mark Staes, a police officer for the city of Rock Island, testified that he was dispatched to the scene of the shooting. Schippers let him in the back door of the residence. After securing the residence, he took Schippers and Remy into an upstairs bedroom. At that point, Schippers told him that Jackson had been on the phone with defendant and then, shortly thereafter, he let defendant and another person into the house. A few minutes later, she heard what she thought were two gunshots. She went downstairs and saw defendant going through Jackson's pockets. Schippers showed him a picture of defendant on her cell phone.

¶ 11    Ranzan Ahmad testified that he was the owner of the 11th Street Mart in Rock Island. The market was equipped with a video surveillance system, which was working on December 18, 2013. He turned the surveillance video over to the police.

¶ 12    Timothy Metzger, a police detective with the city of Rock Island, testified that he collected surveillance videos recorded by the 11th Street Mart convenient store, which was near Jackson's house. He reviewed the videos and located footage of defendant. Redacted portions of the surveillance video were published to the jury. The video begins at 11:33 a.m. on December 18, 2013, and it depicts defendant and Bolden walking across 11th Street into a parking lot, which is located near Jackson's house. Approximately eight to nine minutes later, defendant and Bolden again appear on the video. Metzger described the clothes defendant was wearing as blue jeans, a black "leather-ish looking" coat, a "[g]rayish colored

stocking cap," and white tennis shoes. He described Bolden's clothing as dark colored jeans with a white T-shirt "hanging out underneath" a "gray or purplish hoodie" under a "darker or black outer coat."

¶ 13 Chad Sowards, a police detective with the city of Rock Island, testified that he responded to the scene of the shooting and interviewed Schippers. During that interview, Schippers told him that defendant was at the residence during the shooting and that she observed him going through Jackson's pockets afterwards. Sowards then executed an arrest warrant for defendant at defendant's girlfriend's residence in Davenport, Iowa. At the time of his arrest, defendant was wearing a white hooded sweatshirt and maroon jeans. Sowards stated that defendant waived his *Miranda* rights and agreed to speak to the police. According to Sowards, defendant told him that he was at his residence from 3 p.m. on December 17, 2013, when he was dropped off by Jackson and Schippers, until 3 p.m. on December 18, 2013, when his girlfriend picked him up and took him to her house. Sowards further testified that defendant told him the last time he had been at Jackson's home was December 17, 2013. Sowards's interview of defendant was recorded and the recorded interview was published to the jury.

¶ 14 Herve Denain, a crime scene technician for the Davenport, Iowa police department testified that the Rock Island police department had requested him to assist with collecting evidence from a Davenport residence. He collected $227 in cash and a cell phone, both of which were located behind a couch.

¶ 15 Richard Nahnybida, a forensic computer examiner with the Davenport police department, testified that he assisted the Rock Island police department with its investigation of Jackson's homicide. He examined a cell phone and extracted 102 photographs from the phone and memory card. Several of the photographs were entered into evidence. One of the photos was of a left hand with a tattoo on the wrist holding a Glock pistol.

¶ 16 Jennifer MacRitchie, a forensic scientist with the Illinois State Police, testified that one of the dollar bills seized from defendant contained a spot of blood, which she swabbed. Debra Minton, a forensic scientist specializing in deoxyribonucleic acid (DNA) analysis, testified that the blood stain collected from the dollar bill matched Jackson's DNA profile.

¶ 17 Dustin Johnson, a forensic scientist specializing in firearms identification, testified that the four shell casings recovered from Jackson's residence were all fired from the same gun, most likely a 40-caliber Glock or an older Smith & Wesson. He also testified that three of the four bullets recovered from the house and Jackson's body were fired from the same gun. The fourth bullet was too damaged to be identified or eliminated as having been fired from the same gun. However, he stated that bullets could have only been fired from a .40-caliber or 10-millimeter Glock pistol. Although he had not been provided with the gun that shot the bullets, he stated that a Glock 23 fires a .40-caliber Smith & Wesson bullet.

¶ 18 Mark Peters, a forensic pathologist, testified that he conducted the autopsy on Jackson and determined that he had been shot three times, twice in the head and once in the left upper arm.

¶ 19 Scott Preston testified that he worked for U.S. Cellular and that defendant's phone records show he made four calls to Jackson's phone between 11 a.m. and 12 p.m. on December 18, 2013.

¶ 20 The State rested; defense counsel made a motion for a directed verdict, which the trial court denied.

¶ 21    Kamren Bolden, defendant's cousin, testified for the defense. He was 16 years old when Jackson was shot. Bolden stated that, on December 17, 2013, he, defendant, and Jackson spent time at Jackson's tattoo shop and then they all went to the mall to get something to eat, after which Jackson dropped him and defendant back off at defendant's house. According to Bolden, he spent the night at defendant's house and woke up around 8 a.m. on December 18, 2013. Later that morning, he and defendant were in the basement when defendant's younger brother, Aaryis, said that Yolanduis McDuffie, "Blackie," was there. Bolden knew McDuffie from "the neighborhood." He and defendant left defendant's to walk to Jackson's house to buy cannabis while McDuffie and Aaryis stayed home. Before going to Jackson's, they stopped at a convenience store. While they were walking, they ran into Aaryis and McDuffie. Defendant told Aaryis to leave and not to follow them.

¶ 22    Bolden stated that he, McDuffie, and defendant then went to Jackson's house. They knocked on the door and Jackson let them inside. They walked into the kitchen, at which point McDuffie pulled out a black gun and said, "Y'all know what it is. Everybody, get the fuck down." Bolden and defendant dropped to the floor; he heard a gunshot. Bolden jumped up and ran out of the house. Defendant met up with him, and they started walking down the street as they were both distraught and nervous. Bolden walked to a friend's house; defendant went his own way.

¶ 23    Bolden testified he spoke to the police three or four times and he lied to them the first time and told them he was not at Jackson's house because he was scared. The second time he spoke to the police he told the truth. No one promised anything in exchange for his testimony; he did not fabricate the story to save his cousin.

¶ 24    Bolden further testified that defendant and Jackson were friends, he never heard them fight, and he never heard defendant talk about robbing Jackson. Bolden was surprised about the shooting. He pleaded guilty to lying to police and served a term in the Illinois Department of Corrections (DOC).

¶ 25    On rebuttal, Detective Sowards testified that, the first time he interviewed Bolden, Bolden denied any knowledge of the shooting. During the second interview, Bolden told him the version of events, which was substantially the same as his trial testimony. During the third interview, Bolden told him that defendant hugged him and told him to keep his mouth shut.

¶ 26    Following closing arguments, the jury began deliberating. Sometime later, while in the midst of its deliberations, the trial court brought the parties and the jury into the courtroom because the jury had a question regarding an instruction. The court read them an instruction, which had inadvertently been excluded; the jury resumed deliberations.

¶ 27    Later, the jury again returned to the courtroom with a request to review video and audio evidence. Neither the State nor the defense was present during this request. During this interaction, the trial court addressed the jury, in relevant part, as follows:

        "I hear there's a couple things you wish to view. I've got Ms. Bernard here from the State. Obviously, there's nobody else in here. I would just ask that [you do] not discuss the case with yourselves as long as Ms. Bernard is here in. So you can watch whatever you guys want to watch. She's obviously the one who seems to know how to run things because nobody else does. And whatever you want to watch, just let her know."

After some discussion regarding the actual evidence the jury wished to see and hear, the court stated,

> "Well, I'll let you guys talk to Becky because we are out of here. Like I said, I just want to make sure you don't talk about the case because, technically, [she is an] employee of the State's Attorney's office. You know, normally you get to sit here and discuss it, if you watch it, and if you want to watch any more if you want to watch it two or three times, I'll keep her here as long as you guys want it."

After a short recess, the court and the jury reconvened, and the jurors requested to watch the video of defendant's confession. The court announced, "Ms. Bernard is back, present. There is nobody else in the courtroom." The court also asked the jury to "decide as a group as to whether or not you feel that you would like to take a break and come back tomorrow morning and continue your deliberations, or if you wanted us to order you dinner and keep deliberating tonight. That, too, is entirely up to you." The court informed the jury that, when it got to about 5 p.m., it would send the bailiff in to ask what they want to do. The court stated "it's not my goal to lock you in there and force something out of you if you truly think you would like to take a break and start tomorrow refreshed again. That's entirely your decision."

¶ 28    After another recess, the parties returned to the courtroom because the jury had indicated it had reached a verdict. Prior to bringing the jury back in, the trial court informed the parties that the jury had, on two different occasions, "wanted to watch audio or visual evidence that had been submitted" and that it "didn't feel it necessary to contact either of the attorneys at that time." The court further explained that Ms. Bernard came in and hooked everything up and that the jury was told not to discuss anything in front of Ms. Bernard. The court also noted that the jury was supervised by the bailiffs at all times. The jury was then called into the courtroom. It found defendant guilty of first degree murder under an accountability theory and not guilty of first degree murder as the principal.

¶ 29    On April 27, 2015, defense counsel filed a motion for judgment notwithstanding the verdict and, alternatively, for a new trial, followed by an amended motion on June 2, 2015. Following a June 5, 2015, hearing, the trial court denied both motions and then proceeded to the sentencing hearing. At the sentencing hearing, Jackson's mother read a statement in aggravation and defendant's family presented letters in mitigation. The State recommended a sentence of 50 years' imprisonment while defense counsel asked for the minimum sentence. Thereafter, the court noted it had considered the factors in aggravation and mitigation and sentenced defendant to 40 years' imprisonment followed by 3 years' mandatory supervised release (MSR).

¶ 30    On June 10, 2015, defendant filed a series of *pro se* motions, including a "petition for post-conviction relief for ineffective [*sic*] assistance," a "motion for notwithstanding the verdict," and a "motion for reconsideration and new trial." On June 11, 2015, defense counsel filed a motion to withdraw and requested that a conflict attorney be appointed to represent defendant's interests. On that same day, defense counsel also filed a motion to reconsider defendant's sentence.

¶ 31    On July 29, 2015, the trial court conducted a hearing on the pending motions. The court denied all defense motions.

¶ 32    This appeal followed.

¶ 34    On appeal, defendant argues that the trial court (1) committed reversible error when it conducted *ex parte* communications with the jury during deliberations, (2) committed reversible error when it allowed the jury to observe audio and video evidence in the courtroom during deliberations in the presence of a representative of the State's Attorney's office, (3) failed to conduct a preliminary inquiry into defendant's *pro se* allegations of ineffective assistance of counsel, and (4) abused its discretion in sentencing him to 40 years' imprisonment.

¶ 35    Because we find the second issue dispositive, we address it first. Specifically, defendant argues that the procedure used by the trial court in allowing the jury to observe video and audio evidence in the courtroom, while in the midst of deliberations and in the presence of a representative of the State's Attorney office, "chilled jury deliberations and prevented jurors from speaking freely regarding the evidence."

¶ 36    Defendant acknowledges that he did not preserve this issue for appeal since he neither objected at trial nor included the issue in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an error for appellate review, a defendant must raise the issue at trial and in a posttrial motion). Nonetheless, he contends that this court may review the issue for plain error. The State disagrees, asserting that plain-error review is not appropriate because defense counsel acquiesced in the procedure used by the trial court by not objecting once the events were brought to his attention. "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). This is so because "permit[ting] a defendant to use the exact ruling or action procured in the trial court as a vehicle for reversal on appeal 'would offend all notions of fair play' [citation], and 'encourage defendants to become duplicitous.' " *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001), and *People v. Sparks*, 314 Ill. App. 3d 268, 272 (2000)). The record here, however, illustrates that defense counsel had no opportunity to object to the procedure the court used to allow the jury to review the audio and video evidence as he was not even aware of the jury's request until the parties reconvened upon the jury reaching its verdict. Thus, we reject the State's contention that defendant invited the error here. Accordingly, we will address defendant's contention of plain error.

¶ 37    "The plain-error doctrine permits a reviewing court to by-pass normal rules of forfeiture and consider '[p]lain errors or defects affecting substantial rights *** although they were not brought to the attention of the trial court.' " *People v. Eppinger*, 2013 IL 114121, ¶ 18 (quoting Ill. S. Ct. R. 615(a)). The first step in a plain-error analysis is to determine whether a clear and obvious error occurred. *Id.* ¶ 19. If a clear and obvious error occurred, we then consider whether either of the two prongs of the plain-error doctrine has been satisfied. *People v. Sargent*, 239 Ill. 2d 166, 189-90 (2010).

¶ 38    "Plain-error review is appropriate under either of two circumstances: (1) when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error'; or (2) when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Eppinger*, 2013 IL 114121, ¶ 18 (quoting *People v.*

*Piatkowski*, 225 Ill. 2d 551, 565 (2007). The burden of persuasion falls on defendant. *People v. Johnson*, 238 Ill. 2d 478, 485 (2010). We review *de novo* the ultimate question of whether a forfeited error is reviewable as plain error. *Id.*

¶ 39    We begin by noting that it is a basic tenet of our criminal justice system that "deliberations of the jury shall remain private and secret." (Internal quotation marks omitted.) *United States v. Olano*, 507 U.S. 725, 737 (1993). The primary purpose of this " 'cardinal principle' " is to protect the jury's deliberations from improper influence. *Id.* at 737-38. We also note that the issue here does not call into question the trial court's decision to allow the jury to review the requested audio and video evidence, which is a matter within the court's discretion. See *People v. Kliner*, 185 Ill. 2d 81, 163 (1998). Rather, the issue concerns the procedure used by the court in allowing the jury to review the evidence during deliberations.

¶ 40    This court recently addressed situations similar to the one at issue here in *People v. McKinley*, 2017 IL App (3d) 140752, and *People v. Johnson*, 2015 IL App (3d) 130610. At issue in *McKinley* was whether the trial court abused its discretion by allowing the jury, while in the midst of deliberations, to watch a videotape of the defendant's traffic stop in the courtroom and in the presence of a judge, the prosecutor, defense attorney, defendant, and a bailiff. *McKinley*, 2017 IL App (3d) 140752, ¶ 11. In answering the question, the majority found guidance in *Olano*, 507 U.S. at 737-38, our decision in *Johnson*, 2015 IL App (3d) 130610, and *People v. Rouse*, 2014 IL App (1st) 121462.

¶ 41    At issue in *Olano* was "whether the presence of alternative jurors during jury deliberations was a 'plain error' that the court of appeals was authorized to correct under Federal Rule of Criminal Procedure 52(b)." *Olano*, 507 U.S. at 727. Specifically, in that case, the trial court allowed two alternate jurors to retire with the jury and stay with it throughout deliberations, although the court instructed the alternates that they could not actually participate in the discussions. *Id.* The Court noted while the presence of third parties during jury deliberations could impinge on the privacy of the deliberations, reversal was warranted only if the defendant suffered prejudice as a result of the intrusion. *Id.* at 737-38. The Court then noted that the presence of alternative jurors during jury deliberations could prejudice a defendant because the alternates may have actually participated in the deliberations verbally or via their body language, or their presence could have exerted a " 'chilling' " effect on the jurors. *Id.* at 739. Ultimately, the Court found the defendant failed to establish prejudice and noted, "Nor do we think that the mere presence of alternate jurors entailed a sufficient risk of 'chill' to justify a presumption of prejudice on that score." *Id.* at 741.

¶ 42    In *Johnson*, this court considered whether the trial court's decision allowing the jury to review video evidence during deliberations and in the presence of the judge, prosecutor, defendant, and defense counsel was presumptively prejudicial because the presence of the above "parties impaired the jury's ability to deliberate and thoroughly examine the evidence." *Johnson*, 2015 IL App (3d) 130610, ¶ 14. In a divided opinion, the majority concluded that viewing the video in the courtroom and in the presence of others was not prejudicial because "[n]othing in the record suggest[ed] that the judge, the prosecutor, or defense counsel affected the jury's ability to analyze the video evidence." *Id.* ¶ 20.

¶ 43    In *Rouse*, the defendant argued that the trial court's decision requiring the jury to watch video evidence in front of the parties and the judge " 'infringed upon the sanctity and privacy that is so critical to jury deliberations.' " *Rouse*, 2014 IL App (1st) 121462, ¶ 73. The court disagreed, noting that "No one communicated with the jurors while they viewed the

- 8 -

recording. After viewing the recording, the jury returned to the jury room to deliberate. Under the record before us, we find no indicia of prejudice or anything improper having occurred during the replay of the surveillance footage." *Id.* ¶ 79.

¶ 44 Ultimately, the *McKinley* majority found that the trial court's decision, allowing the jury to view the video in the courtroom and in the presence of a judge, prosecutor, defense attorney, defendant, and bailiff did not create a chilling effect on the jury where the record contained no evidence that the presence of third parties in the courtroom affected the jury in any way. *McKinley*, 2017 IL App (3d) 140752, ¶ 23.

¶ 45 We find the above cases distinguishable from the one at bar. In *Olano*, the alternate jurors present during the jury's deliberations had no obvious ties to the prosecution or the defense. Further, in *McKinley*, *Johnson* and *Rouse*, all parties, including the defendants and their respective counsel, were present in the courtroom while the jury reviewed the video evidence. Thus, if any indication of impropriety did exist, the judge or one of the parties would have noticed and any evidence of prejudicial impact would likely have been found in the respective records.

¶ 46 In this case, however, the jury reviewed evidence while in the presence of an employee of the State's Attorney's office and a court bailiff. While the record indicates the trial court instructed the jury that it should not discuss the case in front of the State employee the first time the jury requested to review evidence, no similar instruction was given during the jury's second request to review evidence. Further, even if the jury did not discuss the case while in the presence of the bailiff or the employee of the State's Attorney office, we simply have no way of determining what affect their presence had on the jury. As defendant notes, the employee of the State's Attorney's office or the bailiff could have frowned at a piece of evidence or scoffed at defendant's testimony. However, neither the judge, nor defendant, nor defense counsel was present to oversee the interaction and to observe any impropriety. Thus, we find the trial court committed a clear error by allowing the jury to review the video and audio evidence in this manner.

¶ 47 Having found a clear and obvious error, we now consider whether the error rises to the level of plain error. Under the second prong of the plain-error doctrine, a "defendant must demonstrate not only that a clear or obvious error occurred [citation], but that the error was a structural error [citation]." *Eppinger*, 2013 IL 114121, ¶ 19. Structural errors are those which "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." *People v. Herron*, 215 Ill. 2d 167, 186, (2005). "An error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *People v. Thompson*, 238 Ill. 2d 598, 609.

¶ 48 Based on the record before us, we cannot say with any degree of confidence that the procedure employed by the trial court in this case did not affect the jury's deliberations or result in bias. On the other hand, we can say with absolute certainty that allowing the jury to review evidence in the courtroom during deliberations and only in the company of an employee of the State's Attorney's office and a court bailiff rendered defendant's trial "fundamentally unfair" and "an unreliable means of determining guilt." That is, we find that allowing a representative of the State to be in the room while the jury reviews evidence, without any prior notice to defendant, to be so far beyond the pale of what is expected in a criminal jury trial as to "erode the integrity of the judicial process." *Herron*, 215 Ill. 2d at

186. Accordingly, we find second prong plain error. We reverse defendant's conviction and sentence and remand for a new trial.

¶ 49 Having reversed defendant's conviction and sentence due to the aforementioned error, we need not consider defendant's remaining contentions on appeal.

¶ 50                                                    CONCLUSION

¶ 51 For the foregoing reasons, we reverse the judgment of the circuit court of Rock Island County and remand for further proceedings.

¶ 52 Reversed; cause remanded.