2024 IL App (1st) 220316-U

No. 1-22-0316

Order filed March 1, 2024

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 17 CR 12603 |
| WILLIAM STOVALL, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Ursula Walowski, |
| | ) | Judge presiding. |

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mitchell and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held:* The State's comments during opening statements and closing arguments were not improper; and the trial court's finding that defense counsel was not ineffective was not manifestly erroneous. Affirmed.

¶ 2    Following a jury trial, defendant, William Stovall, was found guilty of the first-degree murder of Glennell Fairley, attempted first-degree murder of King Collier, and aggravated battery with a firearm of Collier. He was sentenced to 45 years' imprisonment for murder, 25 consecutive

1

years' imprisonment for attempted murder, and six concurrent years' imprisonment for aggravated battery. On appeal, defendant contends the State's opening statements and closing arguments contained improper comments, including that witnesses were afraid to come forward. He also contends that it was manifestly erroneous for the trial court to find that trial counsel was not ineffective for failing to investigate school records that would have undercut eyewitness testimony or for failing to hire an expert in eyewitness identification. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     At trial, the following evidence was presented. Katherine Moore testified that she was the mother of the victims, Fairley and Collier. At 9:30 p.m., on July 9, 2016, Collier, who was 21 years old, left home to go to a basketball game. Less than an hour later, she received a call that both Fairley and Collier had been shot. She later learned that Fairley died.

¶ 5     N'Tajah Reed testified that she was dating Fairley in July of 2016. On the night in question, she and Fairley went to Ogden Park at 10:45 p.m. for a basketball game. Collier got into a fight with "one of the older guys," so Fairley got involved. The "older guy" then "went on the side on his phone." Reed testified that she felt uncomfortable and wanted to leave, but Fairley wanted to finish the game. Reed went and sat in the car. From inside the car, she saw another "scuffle" break out. She then saw people running and heard six gunshots. She ducked down. Collier came and told her Fairley had been shot. They went to the hospital and learned that Fairley had died.

¶ 6     Cortez Felton testified that on the night in question, he went to Ogden Park to play basketball in a game involving younger people against older people. Felton, Collier, Fairley, and Jovante Turner were on the "young" team. "Coach Osky," also known as "Pig," was on the older team. A fight broke out between Pig and Collier, but someone broke it up. Pig then said he had a blister on his foot and left for about five minutes. As Fairley was running up the side of the court,

Pig punched him, and another fight broke out. Approximately 30 seconds later, two shots were fired into the air.

¶ 7    Felton testified that defendant fired the shots. Defendant was standing about two feet from Fairley and Collier, and Felton was about five feet away from Fairley and Collier. During the first two shots, Felton was looking at defendant. He stood there for a couple of seconds because he was in "shock" and "stuck." He then started running but turned around and saw defendant's face from the side as defendant continued to shoot. Defendant was wearing black pants, red shoes, and a red hoodie. The basketball court was well-lit.

¶ 8    Felton testified that he also saw gunshots being fired out of the driver's side of a gray minivan. He was about 12 feet from the minivan and saw that the shooter was "light-skinned" and had a "wave cut." Collier and Fairley ran in the opposite direction of Cortez while both defendant and the person in the minivan shot at them. Cortez stated that there were 12 to 13 shots fired. When the shooting stopped, Felton checked on Fairley and Collier. Fairley collapsed and was taken to the hospital.

¶ 9    At the hospital, Felton provided a description of defendant to police. On September 15, 2016, Detective Awadallah showed Felton a photo array, and he identified defendant as the shooter that was not in the minivan. Felton testified that he was "110 percent" certain that defendant was the shooter. He did not know defendant prior to the day of the shooting. He did not tell anyone about defendant being the shooter.

¶ 10    King Collier testified that on July 9, 2016, he was 15 or 16 years old and playing basketball. Collier got into an altercation with "Pig" that Fairley interrupted. Pig then walked off to make a phone call. After the game resumed, Pig initiated another fight with Fairley. Collier tried to break the fight up, but heard gunshots and began to run. He and Fairley ran in the same direction and

3

continued to hear gunshots. After the gunfire stopped, Collier saw Fairley, who had been shot, leaning on a gate and mumbling. They were both taken to the hospital, where Fairley later died.

¶ 11    Collier eventually learned that portions of the basketball game had been recorded on a cell phone. The footage was shown in court. Collier was asked to identify Pig in the video. The shooting was not captured on video.

¶ 12    Jovante Turner testified that he lived in Englewood and was Fairley's half-brother. He testified that Coach Osky was also known as "Pig." During the basketball game, Pig was "sticking some real rough defense" on Collier. After the game, Pig went to the side to use his phone. Before the start of the next game, Pig approached Fairley and a physical altercation ensued.

¶ 13    Turner then heard a gun "cock" and ducked, looking over his shoulder. He saw defendant, who was standing about three to five feet away, wearing a red hoodie that was "up" but not covering his face. Defendant was holding a gun. Defendant then shot a gun into the air, and Turner ran to his car. As he looked back, he saw defendant shooting towards where they were standing. He took cover and heard 7 to 10 more gunshots.

¶ 14    Turner saw the gunshot victims and went to the hospital. An officer tried to speak to him at the hospital, but Turner was feeling upset and "traumatized," so he did not speak to the police.

¶ 15    Turner testified that prior to the night of the incident, he had seen defendant in school at Scott Joplin Elementary School and in high school at Hyde Park Career Academy. They were not friends and had never "hung out." Turner testified that he knew defendant's girlfriend, Ciara Jamison. He was Facebook friends with Jamison, so used Facebook to look for defendant.

¶ 16    Turner found defendant's photo on Facebook and just "sat and thought about it," but did not contact the police. Turner testified that he was "scared." When asked why he was scared, Turner stated that "just like the area we were from and he had just shot my brother." When asked

what area he was from, Turner answered, "The Englewood area." Turner then spoke with his uncle, who encouraged him to go to the police.

¶ 17    Turner later met with the police to view a photo array. He declined to have the identification procedure video recorded or audio recorded because he didn't want to "put too much of [himself] out there." He identified the shooter as defendant.

¶ 18    A few months later, Turner viewed a physical lineup. He declined to have the procedure videotaped because he was "still unsure of the outcome." When asked what he meant by that, Turner answered, "Of my safety." Even though he was afraid to go back to Englewood, he did so because his family was there.

¶ 19     The State then rested.

¶ 20    Dawon Harris testified for the defense. He stated that he was at Ogden Park on the night in question. Two fights broke out during a basketball game. He observed two cars pull up and a "skinny" light-skinned African American male with "long dreads" got out of one of the cars holding a gun. Harris saw someone talking to the man and pointing to a person. Harris heard the gun "rack" and immediately turned and ran. He heard five or six shots.

¶ 21    On cross-examination, the State asked if Harris remembered "a few days ago" when Harris had a conversation with the prosecution and Harris claimed to not remember anything. Harris replied, "Yeah." Harris testified that he did not remember speaking with detectives on August 11, 2017, and telling them that he turned, heard a gun rack, but did not see who did it.

¶ 22    At the conclusion of the trial, the jury found defendant guilty of first-degree murder of Fairley, and attempted murder and aggravated battery with a firearm of Collier.

¶ 23                                    Post-Trial Motions

¶ 24  On November 6, 2019, defendant filed a motion for a new trial. Prior to the hearing on the motion, trial counsel withdrew and an assistant public defender was appointed.

¶ 25  On May 10, 2021, the assistant public defender filed a motion for a judgment of acquittal or in the alternative, a new trial. The motion alleged that the trial court erred in overruling defense counsel's objection to the State's comments during opening statement regarding the neighborhood the shooting took place in, and about snitches. The motion alleged that the trial court erred in overruling an objection to improper questioning of Turner and his being afraid. It also alleged that trial counsel was ineffective for failing to investigate whether Turner went to school with defendant, failing to consult with an eyewitness identification expert witness, and failing to object to comments made by the State in opening statements and closing arguments.

¶ 26  At the hearing on defendant's motion, Jamison testified that defendant was the father of her two children. Although she did not graduate, she attended high school at Hyde Park Career Academy from 2009-2011. She spoke with defendant's trial counsel and paid him money. Trial counsel did not ask her if she knew Turner or if she went to high school with Turner. She did not know that Turner was going to testify that he knew her. They were classmates and Facebook friends, but did not socialize outside of school.

¶ 27  Jamison replied, "yeah," when asked if she was aware that defendant was still going to Hyde Park Career Academy while she was there. She stated that they attended Hyde Park Career Academy at the same time and that they learned they were both enrolled there at a family function they attended in 2010.

¶ 28  Defendant testified that he frequently moved around and had attended several schools. He attended Vivian E Summers for his freshman year of high school, then transferred to Hyde Park

Career Academy on September 15, 2009. He dropped out of school on February 17, 2010, after attending only five or six days of school.

¶ 29    Defendant stated that trial counsel had represented him on a previous case and visited him in jail one time in May of 2018, even though defendant asked him to come more often. Trial counsel did not review police reports with him or give him a chance to read them. He did not speak with defendant about his relationship with Jamison, and did not tell defendant who the witnesses were or what they would be testifying to. The first time defendant became aware of Turner was at trial. Trial counsel told him that he did not hire an identification expert witness because of the cost.

¶ 30    Turner testified that he went to high school with defendant in 2009 and 2010 at Hyde Park Career Academy, and that he would see him there with Jamison. Turner also knew defendant from the surrounding area prior to high school.

¶ 31    Trial counsel testified that he did not believe it was important to question whether or not defendant went to school at the same time as Turner because it had been verified that defendant did go to school with Turner at some point. Trial counsel stated that trying to impeach Turner on that point would risk raising questions about "all other contacts" that Turner might have had with defendant over the years. Even if he had obtained defendant's school records, he may not have used them based on how he was proceeding.

¶ 32    The trial court found that the evidence presented at the hearing was "non-impeaching" and that Turner, "if anything, to the contrary, solidified his identification of defendant." The court found that the testimony presented at the hearing and the school records would not have helped defendant prevail at trial. "I actually find that it would have been quite the opposite as the identification would have been solidified based on the evidence that I have heard."

7

¶ 33    In terms of opening statements and closing arguments, the trial court found that its rulings were appropriate, and that based on the record and the arguments as a whole, "I don't find anything that was done improperly." The motion was denied.

¶ 34    The trial court sentenced defendant to 45 years' imprisonment for first-degree murder, and 25 years' imprisonment for attempted first-degree murder, to be served consecutively. The court also sentenced defendant to six years' imprisonment for aggravated battery, to be served concurrently. Defendant now appeals.

¶ 35                                    II. ANALYSIS

¶ 36                        A. Improper Prosecutorial Comments

¶ 37    On appeal, defendant first contends that the State made improper comments during its opening statements and closing arguments.

¶ 38    The purpose of an opening statement is to give the jury a brief and general introduction to the factual issues in dispute and what each party expects the evidence to prove. *People v. Jones*, 2016 IL App (1st) 141008, ¶ 22. The parties do not enjoy the same "wide latitude" in commenting on the case as they do in closing arguments. *Id.* Comments that are inflammatory, that are irrelevant to the question of guilt, or that tend to bolster a witness's credibility, are improper. *People v. Richmond*, 341 Ill. App. 3d 39, 47 (2003). Improper comments require a new trial only "if the jury could have reached a contrary verdict" in their absence, or in other words, if "the reviewing court cannot say that [they] did not contribute to the defendant's conviction." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). Our review of whether the State's improper comments mandate a new trial is *de novo*. *Id.*

¶ 39    Defendant claims that the State improperly stated that witnesses were afraid to come forward because the shooting had taken place in Englewood, and they could be targeted as

8

"snitches." Defendant argues that there was no evidence presented that defendant threatened the witnesses, and thus the comments were not based on evidence and therefore inflammatory. The complained-of comments, in context, were as follows:

> "The witnesses that were out there are afraid of this man. Out of all the people that were out there that night only two people actually admitted to getting a good look at the shooter. Why, because this isn't a wealthy suburban neighborhood. This is Englewood. And unfortunately, for the good people of Englewood, shootings like this happen all the time, and witnesses are afraid to come forward, and witnesses are targeted as snitches.

> And the defendant's actions made those witnesses afraid."

¶ 40    Defense counsel's objections to these comments were overruled, which we find proper. The comments made by the State during opening statements discussed the evidence that would be presented and matters that could be reasonably inferred from that evidence. *People v. Leger*, 149 Ill. 2d 355, 392 (1992) (opening statement may include a discussion of the expected evidence and reasonable inferences from the evidence.). During trial, Turner testified that he had been "afraid" to come forward because of "the area [they] were from" and because he had seen defendant shoot his friend. When asked what area he was from, Turner stated, the "Englewood area." He also testified that he initially refused to allow the photo array and identification procedure to be recorded because he did not want to put too much of himself "out there," and that he was concerned for his safety. The jurors saw a video from the basketball court, that showed there were over 25 people there on the night in question. But, as the State pointed out, only a few witnesses came forward and agreed to testify. Accordingly, we find that the comments made by the prosecution

during opening statements were merely a discussion of the expected evidence and reasonable inferences from that evidence. *Id.*

¶ 41    Next, defendant contends that the prosecution made improper comments during closing arguments. However, these comments were not objected to at trial and therefore this issue is not preserved for appeal. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (both a trial objection and a written posttrial motion raising the issue are necessary to preserve an issue for review). Defendant nevertheless urges us to review these comments under the plain-error doctrine. The plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 16, 186-87 (2005). The first step of plain-error review is determining whether a clear and obvious error occurred. *People v. Henderson*, 2017 IL App (3d) 150550, ¶ 37. If a clear and obvious error occurred, we then consider whether either of the two prongs of the plain-error doctrine has been satisfied. *Id.*

¶ 42    The purpose of closing arguments is to provide the parties with a final opportunity before the jury to review the admitted evidence, to explain the relevant law, and to assert why the evidence and the law compel a favorable verdict. *People v. Williams*, 2022 IL 126918, ¶ 40. "An error in closing argument is not a typical trial error in that it does not involve the admission of inculpatory evidence or the rejection of exculpatory evidence but rather commentary on the evidence that has been presented." *Id.* This is why juries are told that closing arguments are not evidence and " 'any statement or argument made by the attorneys which is not based on the evidence should be disregarded.' " *Id.* (quoting Illinois Pattern Jury Instructions, Criminal, No. 1.03 (2011)).

¶ 43    A prosecutor has wide latitude in making a closing argument and may comment on the evidence and any reasonable inferences that arise from it, even if those inferences reflect negatively on the defendant. *Id.* ¶ 44. A prosecutor may comment on matters invited or provoked by defense counsel. *Id.* Such comments should be considered in the context of the entire closing argument, as well as the trial court's instructions that arguments are not evidence, that the State bears the burden of proving defendant's guilt beyond a reasonable doubt, and that defendant need not present any evidence. *Id.* See *People v. Ceja*, 204 Ill. 2d 332, 357 (2003) ("Comments in closing argument must be considered in context of the entire closing argument of both the State and the defendant.")

¶ 44    Defendant first claims that the prosecution improperly implied that defendant was part of an organized group with Pig as the leader because the State referred to defendant as the "muscle" of a "crew," and called the murder an "execution." These characterizations were based on the evidence presented. The testimony at trial showed that there was an altercation between Pig and the victims, that Pig went to the side of the basketball court and made a phone call, and that a few minutes later defendant arrived on the scene with a gun and shot the victims, killing one of them. Testimony also revealed that there was a second car that arrived on the scene. The State's comments suggesting that defendant was part of a crew and that he was there to execute someone were reasonable inferences drawn from the testimony presented at trial. *Williams*, 2022 IL 126918, ¶ 44.

¶ 45    Defendant next contends that "while the State did not mention race specifically, the State's contrast of Englewood to the wealthier areas of Chicago such as Winnetka, Evanston, and Sauganash also implicated race," during rebuttal arguments. Defendant does not cite to a page number in the record in support of this argument. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 15, 2023)

11

(argument shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities "and the pages of the record relied on."). Upon examination of the record, however, it is clear that the complained-of comments were invited by defense counsel.

¶ 46 During closing arguments, defense counsel noted that a witness did not come forward for weeks because "he was afraid and maybe so, maybe not, maybe he didn't know." Defense counsel stated that because witnesses did not come forward right away, it was reasonable to infer that they got their information from elsewhere. In response, the State noted that it might be hard for defense counsel to understand why witnesses did not come forward because counsel "does not live in Englewood. The rules in Englewood are not the rules of Evanston. They are not the rules of Winnetka. They are not the rules of Sauganash."

¶ 47 As can be seen, the State was responding to defense counsel's argument that it was not believable to have so many witnesses on the basketball court and have only two people come forward to identify defendant. Additionally, Turner testified at trial that he did not come forward right away when he found the picture of defendant because of "the area we were from, and he had just shot my brother." Turner clarified that he was from the "Englewood Area." The State was merely echoing the witness's comments regarding his fears of living in Englewood.

¶ 48 Defendant also contends that the State improperly called defendant a cold-blooded killer. While a prosecutor may not characterize a defendant as "evil," he or she may characterize the defendant's actions as a permissible comment on the evidence. See *People v. Thomspon*, 2016 IL App (1st) 133648, ¶ 49. Given that defendant was convicted of firing a gun into the air in front of a crowd of people, and then shooting at the victims, killing one of them, we find that the "cold-blooded" comment did not rise to the level of clear or obvious error. See *id.* (given that the

defendant was convicted of firing a gun into a crowd of unsuspecting people, the court found that the "cold-blooded" comment did not rise to the level of clear or obvious error.)

¶ 49    Next, defendant challenges the prosecution's use of the word "brave" to describe the State's witnesses, and "coward" and "bully" to describe defendant. Once again, these characterizations were based on reasonable inferences from the record. The witnesses indicated they were afraid to come forward but did so anyway, and therefore calling them brave was based on the evidence. Testimony at trial revealed that defendant opened fire on a basketball court filled with unsuspecting people, and then fled. Based on the evidence, defendant could be characterized as both a bully and a coward. *Williams*, 2022 IL 126918, ¶ 44 (a prosecutor has wide latitude in making a closing argument and may comment on the evidence and any reasonable inferences that arise from it, even if those inferences reflect negatively on the defendant.)

¶ 50    Defendant, relying on *People v. Smith*, 2017 IL App (1st) 143728, claims the State used the comments to juxtapose the State's "brave" witnesses with the cowardness of defendant. However, in *Smith*, the prosecution made a direct comparison of the defendant with the victim by describing the victim as a "loving" husband and father, and "everything defendant was not." *Id*. ¶ 52. The court found that the comments unfairly invited the jury to evaluate and compare the character of the two key figures in the case. *Id*. ¶ 53.

¶ 51    Here, the prosecution did not make any comparisons between the witnesses and defendant. The comments about the witnesses being brave occurred during closing arguments when counsel stated, "defendant fled the scene" because "that's what cowards do." Then, during rebuttal argument, the State noted that Turner and Felton were "brave enough" to testify. These two comments did not occur together, and therefore did not invite the jury to evaluate or compare the character of the key figures in this case.

¶ 52    Defendant also argues that the prosecutor improperly commented on defendant's appearance during opening statements. Specifically, the State commented that the jury should not "be fooled by how defendant looks," because on the date in question, "defendant wasn't sitting in a shirt and tie armed with a pen. He was armed with a semiautomatic handgun ready to be a killer." Defendant claims, relying on *People v. Stuckey*, 231 Ill. App. 3d 550, 565 (1992), that the State was trying to "fool or gain sympathy from the jury" by this comment.

¶ 53    In *Stuckey*, the defense objected to the State's comment that the victim's "blood is on his feet and it's on his conscience he knows he did it, he know that he was the one that raped her as he sits here now in that suit and tie, clean shaven with a nice haircut." 231 Ill. App. 3d at 559. The court found that this comment was improper, without giving a reason, but found that the error was harmless because the evidence against the defendant was overwhelming. *Id*. at 565.

¶ 54    Here, evidence was presented that defendant was wearing a hoodie on the date in question and was armed with a semiautomatic handgun. We find that the State's comment stating that defendant was not wearing a shirt and tie and was not armed with a pen on the date in question, to be based on the evidence. However, even if we were to find that this comment was improper, it was not structural in nature. See *Williams*, 2022 IL 126918, ¶ 56 (closing arguments do not rise to second-prong plain error because closing remarks generally do not undermine basic protections afforded to criminals).

¶ 55    Defendant next argues that the prosecutor's comments regarding Fairley's mother were improper. The State, during closing arguments, commented that defendant was not brave enough to "hear the screaming cries of a mother who just realized her worst nightmare had come true." The State also asked the jury to "stand up" for the victims and for "every mother who expects their

14

child to be safe on a basketball court." Defendant contends these comments attempted to introduce "irrelevant and prejudicial matters" into the trial.

¶ 56    While our supreme court has found that argument by the prosecution which dwells upon the decedent's family or seeks to relate a defendant's punishment to the existence of family is inflammatory and improper, it has also noted that common sense tells us that murder victims do not live in a vacuum and that they leave behind family members. See *People v. Harris*, 225 Ill. 2d 1, 31 (2007) (common sense tells us that murder victims do not live in a vacuum, and that, in most cases, they leave behind family members). Here, the prosecutor's comments about the victim's mother were brief, and the prosecutor did not dwell on the victim's mother or relate defendant's punishment to the existence of the victim's mother. *Id*. (argument by the prosecution which dwells upon the existence of family is inflammatory and improper). We find that the prosecution's brief mention of the victims' mother was not improper.

¶ 57    Defendant next takes issue with the following comments the State made in rebuttal closing argument:

"When you were first sworn in after you were selected as members of this jury, you took an oath, and that oath requires you to fearlessly administer justice in this matter in the case that's been put before you.

And the fearless administration of justice [demands] that you find this defendant guilty of first degree murder."

¶ 58    Defendant claims that these comments were akin to improperly instructing the jury that their oath "required them to find defendant guilty." We note, however, that the State did not tell the jury it was obligated by its oath to return a particular verdict. See *People v. Nelson*, 193 Ill. 2d 216, 227 (2000) (improper argument for State to tell jury that whenever jurors acquit a person who

15

has been proven guilty, they do not follow their oaths). Rather, the State said the jury's oath required it to fearlessly administer justice, which is proper. See *People v. Barrow*, 133 Ill. 2d 226, 260 (1989) (the State may "urge a fearless administration of the law.").

¶ 59    In *Barrow*, the State made the following comments during rebuttal argument:

> "That was your oath. You took it very serious, and ladies and gentlemen of the jury, the only way that you can meet that responsibility, because the true verdict rendered, the true verdict is the verdict supported by the evidence in this case, and the only way that you will meet and stand up to that obligation, that oath, is by returning verdicts of guilty on each and every count." *Id.* at 259.

¶ 60    Our supreme court found that these remarks could reasonably be construed as commenting on the evidence and strength of the State's case, which is permissible. *Id.* at 259-60. Similarly here, the State's remarks could reasonably be construed as commenting on the strength of the State's case, and urging the jurors to fearlessly administer justice.

¶ 61    Finally, we note that if any of these unpreserved complained-of comments were to amount to error, they would nevertheless not rise to the level of plain error because they were not structural in nature. See *Williams*, 2022 IL 126918, ¶ 56 (closing arguments do not rise to second-prong plain error because closing remarks generally do not undermine basic protections afforded to criminals).

¶ 62                    B. Ineffective Assistance of Counsel

¶ 63    Defendant's final contention on appeal is that defense counsel was ineffective for failing to: (1) object to improper comments during opening statements and closing arguments; (2) obtain defendant's school records; and (3) call an eyewitness identification expert.

¶ 64    Pursuant to *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a defendant presenting a claim of ineffective assistance of counsel must allege facts sufficient to prove both (1) that

16

counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Because both prongs of the *Strickland* analysis must be proven, if an ineffective-assistance claim fails under either prong, we need not determine whether the claim also fails under the other. *People v. Bell*, 2021 IL App (1st) 190366, ¶ 62.

¶ 65    "A defendant is entitled to competent, not perfect, representation, and mistakes in trial strategy or judgment will not, of themselves, render the representation ineffective." *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26. "The only exception to this rule is when counsel's chosen trial strategy is so unsound that 'counsel entirely fails to conduct any meaningful adversarial testing.' " *People v. West*, 187 Ill. 2d 418, 432-33 (1999) (quoting *People v. Guest*, 166 Ill. 2d 381, 394 (1995)). We evaluate the reasonableness of counsel's conduct from his or her "perspective in light of the totality of circumstances of the case." *Tucker*, 2017 IL App (5th) 130576, ¶ 54. "Where, as here, the court reaches a determination on the merits of a defendant's ineffective assistance of counsel claim, we will reverse that determination only if it was manifestly erroneous." *Bell*, 2021 IL App (1st) 190366, ¶ 63. Manifest error is "error that is clearly plain, evident, and indisputable." *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25.

¶ 66                            1. Objections to Improper Comments

¶ 67    First, we have already determined that the prosecutor's complained-of remarks in opening statements and closing arguments were not improper. Since an attorney's performance is ineffective only if it falls below an objective standard of reasonableness, counsel cannot be deficient if he fails to object to remarks that were proper. See *People v. Evans*, 209 Ill. 2d 194, 222 (2004) (admission of testimony not error and therefore, counsel was not deficient for failing to object). Accordingly, we find that defendant's ineffective assistance of counsel claim based on

counsel's failure to object to the State's comments in opening statements and closing arguments must fail.

¶ 68                                    2. Defendant's School Records

¶ 69    Next, defendant claims that defense counsel was ineffective for failing to obtain his school records. Specifically, defendant claims that defense counsel should have impeached Turner's testimony that he knew defendant from grade school and high school. Defendant contends that obtaining these records would have undercut any identification Turner made because the records show that defendant could not have been at the same high school as Turner "for more than a couple of days."

¶ 70    Upon review of the school records contained in the record on appeal, defendant was enrolled at Hyde Park Career Academy, the same high school as Turner, from September 15, 2009, to February 1, 2010. This corroborates Turner's testimony that he went to high school with defendant. While defendant claims that he only attended a handful of days at the school, that would not negate Turner's testimony that he knew defendant from school. Defense counsel argued at trial that even though Turner saw defendant "in the hallway," he did not identify defendant until weeks later, and therefore Turner must have gotten information about who the shooter was "from elsewhere."

¶ 71    Defense counsel confirmed at the hearing on defendant's post-trial motion that even if he had obtained defendant's school records, he could not state that he would have used them based on his "theory of the case or how he was proceeding." See *People v Patterson*, 217 Ill. 2d 407, 442 (2005) ("matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing."). Because the decision to present school records was one of trial strategy, defense counsel's performance did not fall below an

18

objective standard of reasonableness. Moreover, as the trial court noted, the introduction of the records would not have changed the outcome of the case. The trial court stated that the "identification would have been solidified based on the evidence that I have heard." We agree. Accordingly, we find it was not manifestly erroneous for the trial court to find that defense counsel was not ineffective for failing to produce defendant's school records.

¶ 72                    3. Eyewitness Identification Expert

¶ 73     Defendant contends that defense counsel was ineffective for failing to call an expert on eyewitness identification despite the fact that identification testimony was critical to the State's case. Defendant argues that an eyewitness expert could have offered testimony as to how Felton was "110 percent" certain that defendant was the shooter "despite only having a partial view at night of a short duration."

¶ 74     However, defense counsel's theory of the case was not that the eyewitnesses did not get a good enough look at the shooter, but rather that the eyewitnesses heard about defendant from "elsewhere," and came forward weeks later with a fabricated identification of defendant. Defense counsel testified in the post-trial hearing that his theory of the case was that defendant was not at the scene of the shooting and that Turner and Felton would have contacted police sooner if they had actually seen him there that night. Accordingly, an eyewitness expert would not have supported defense counsel's theory of the case.

¶ 75     We reiterate that matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing. *Patterson*, 217 Ill. 2d at 442. Where, as here, an expert identification witness would not have supported defense counsel's theory of the case, we cannot find that counsel's performance fell below an objective standard of reasonableness. Accordingly, we find that it was not manifestly erroneous for the trial

court to find that defense counsel was not ineffective for failing to call an expert identification witness.

¶ 76                                    CONCLUSION

¶ 77    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 78    Affirmed.