NOTICE
Decision filed 04/27/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250218-U

NO. 5-25-0218

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 24-CF-1138 |
| | ) | |
| KRISTAN C. FLEMING, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOLLINGER delivered the judgment of the court.
Presiding Justice Cates and Justice Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the defendant's conviction for misdemeanor retail theft, but vacate her sentence and remand to the trial court for resentencing, because the trial court sentenced the defendant under the mistaken impression that the defendant was not eligible for court supervision.

¶ 2    The defendant, Kristan C. Fleming, was convicted of one count of misdemeanor retail theft following a trial by jury. She was sentenced to three months of conditional discharge. She now appeals her conviction and sentence. For the reasons that follow, we affirm her conviction, but vacate her sentence and remand for resentencing.

¶ 3                              I. BACKGROUND

¶ 4    On August 22, 2024, the defendant was charged, by information, with one count of retail theft over $300, a Class 3 felony, in violation of section 16-25(a)(1) of the Criminal Code of 2012

1

(720 ILCS 5/16-25(a)(1) (West 2022)). The information alleged that on or about June 6, 2024, through on or about July 13, 2024, the "defendant in separate transactions as part of a continuing course of conduct knowingly took possession of certain merchandise offered for sale at Walmart *** having a total value exceeding $300, with the intention of depriving [Walmart] permanently *** of said property without paying the full retail value of" the merchandise. On December 13, 2024, the defendant was charged, by information, with a second count of retail theft, a Class A misdemeanor. The allegation in count 2 of the information was substantially similar to the earlier charge, except that the new allegation contained one specific date, June 24, 2024, did not allege a course of conduct, and alleged that the value of the merchandise did not exceed $300.

¶ 5     The case proceeded to a jury trial on January 29, 2025. The State announced that it would proceed on the misdemeanor retail theft count only. The State moved to amend the charge in count 2 of the information to change the date of the offense to June 9, 2024, and to specify that the merchandise in question was "two drinks." Counsel for defendant had no objection. The State was permitted to amend count 2 by interlineation. The State said it was no longer proceeding on count 1.

¶ 6     Prior to *voir dire*, the prospective jurors were informed that the defendant was charged with the offense of retail theft. During *voir dire*, the prospective jurors were told by the trial court that part of their job was "to weigh the credibility of each of the witnesses," and were asked if they could "give the testimony of a police officer the same consideration as the testimony of any other witness." The first juror to be questioned answered, "Yes." The second juror to be questioned—Juror 113[1]—answered, "No." All 12 of the remaining prospective jurors answered "Yes." No

_____

[1]To protect the privacy of the prospective jurors, they were not identified by name during the *voir dire* process.

additional questioning of Juror 113 with regard to Juror 113's response was conducted, either by the trial court or by the parties. However, the State asked the entire venire of prospective jurors if any of them had

> "had any interaction with the police or [State's Attorney's] office, whether it's a traffic stop, a ticket or being a victim of a crime or being accused of a crime either through your interaction with the police or [State's Attorney's] office, that it was so bad that it still kind of, it's something that you still think about and talk to people about that left such a bad impression that [you] wouldn't be able to be fair and impartial in this case?"

No jurors answered affirmatively. At the jury selection conference that followed, Juror 113 was one of the first four jurors tendered to the parties. Both the State and the defense accepted Juror 113, who therefore was seated on the jury.

¶ 7    The first witness to testify was Deputy Justin Willmore of the Champaign County Sheriff's Office. He testified that on July 13, 2024, at around 11:30 p.m., he responded to a dispatch to the Savoy Walmart to be "a standby for *** employees there wanting to remove an employee that had been caught stealing." Deputy Willmore identified the defendant in court, then testified that he interviewed her as the suspect in the case. He testified that the defendant denied stealing anything from the store, and that the defendant stated that she did not "pay attention to receipts," and "basically just check[ed] out, [did not] pay attention to the things she purchase[d]." He agreed with counsel for the State that the defendant denied "intentionally taking stuff." He further agreed that the defendant's position was that if she did not pay for some items, it was an accident. Deputy Willmore testified that the defendant continued to deny that she would steal anything. On cross-examination, he testified that the defendant offered to "pay for the difference in *** anything that she was undercharged."

3

¶ 8 Anthony Wright was the next witness to testify. Prior to the commencement of his testimony, the trial court instructed the jury that evidence was "going to be presented that the defendant has been involved in conduct other than that charged in the information," and that the evidence was "going to be received on the issues of the defendant's intent, motive, design and knowledge and" could be considered by the jury "only for that limited purpose." The trial court further instructed the jury that it was up to the jury "to determine what weight should be given to this evidence on the issues of intent, motive, design and knowledge."

¶ 9 Wright testified that in July of 2024, he had been working in "asset protection for two years at Walmart." He testified that he left the job in August of 2024. He testified that he was familiar with Walmart's security systems, and that using them was part of his day-to-day work in asset protection. Wright testified that in the summer of 2024, he conducted an investigation into the conduct of the defendant, whom he identified in court. He testified that when investigating possible wrongdoing by "overnight shift" employees, he would "look at break times, lunch times, *** watch the registers, *** watch the doors for anyone walking around with things in their hands" so that he could "back track them to a register to confirm that they actually purchased those or where they came from." He testified that if he observed something suspicious on the video surveillance system, he would "save that section of video to a file on [his] computer," then would "start to search the videos, go to the day before that and watch to see if [he saw] them again, go to the day before that and just compile a folder of *** events" containing the suspicious activity. Wright testified that the video surveillance system was working properly throughout his investigation of the defendant. He testified that once he compiled his folder of suspicious activity, it would "be sent up to a higher authority to get the approval for termination of that employee."

¶ 10 Wright testified that he observed a video of an "incident" on June 9, 2024, involving "three drinks and a bunch of bananas." He testified that "[t]he subject approached a self-checkout register with" the juice bottles and bananas, and "failed to scan the first two bottles of drinks, scanned the third and then the bananas." He added that "[s]he then bagged all of this merchandise, paid for the single drink and the bananas and left the area." He testified that he saved five additional videos of similar conduct by the defendant during the summer of 2024, for a total of six videos. With regard to how the self-checkout registers worked, Wright testified that "[a]s soon as a barcode is scanned the [screen] will flash black for a handful of frames, small white square in the center, and then return to display whatever it was that was scanned." He testified that the register also would "make a sound."

¶ 11 Wright authenticated a DVD that included the six videos of the defendant's conduct, which was admitted into evidence without objection and published to the jury. After each video was played for the jury, Wright provided a narrative of its contents, and testified that the videos were "not recorded with sound," but that the register would have made "an audible beep" when each item was properly scanned. Wright described the June 9, 2024, video in a manner consistent with his earlier testimony. He then testified about the remaining five videos, describing for each video the number of items the defendant actually scanned and paid for, and the total number and kind of items the defendant took with her when she left the register area. With regard to each item not paid for, Wright testified that to his knowledge, the defendant never returned to pay for the items. Wright testified that after he "had acquired enough events and evidence to show that this was not an accident," and that "it was less likely that her missing this many items on this many days was a coincidence," he sent his documentation to a higher authority for "approval for the termination process." He testified that was the end of his involvement in the investigation. He testified that he

5

did not know the defendant prior to his investigation, and that he did not "have any personal dealings with her."

¶ 12 On cross-examination, Wright testified that to his knowledge, the defendant worked as a "stocker *** breaking down pallets of *** merchandise and placing them on shelves." He testified that to his knowledge she did not ever operate a register, or ever monitor the self-checkout registers as part of her job duties. He conceded that in one of the videos, the defendant could be seen manually entering a digital code for some produce she was scanning, and then punching in the correct number of items she was purchasing. He agreed that in another portion of the video, the defendant could be seen talking to a fellow Walmart employee who was monitoring the self-checkout area and assisting customers there. Wright further agreed that as the defendant continued to speak with the Walmart employee, she successfully scanned one lime Chobani yogurt, but did not successfully scan a second lime Chobani yogurt. He conceded that during the June 9, 2024, incident, the defendant took the barcode tag off of the bananas and tried to scan it, then placed the bananas on the scale to weigh them. Wright agreed that the defendant appeared to scan her employee discount card during each of the transactions, and that the discount provided by the card "would make whatever she was paying for a different price than what's on the [price] sticker."

¶ 13 Following Wright's testimony, the State rested. Outside the presence of the jury, the defendant moved for a directed verdict, arguing that the State had not provided sufficient evidence from which the jury could conclude that the defendant had "the requisite intent" to commit retail theft. The trial court denied the defendant's motion.

¶ 14 The defendant testified that she did not ever intend to steal merchandise from Walmart. She testified that she began working for Walmart in February of 2024, as a stocker. She testified that she was never "trained to work the registers" or "to work or monitor the self-checkout lane."

6

The defendant testified that she worked three 12-hour overnight shifts per week, to supplement her income from her day job as a nurse. She testified that she remembered the banana incident, and that it occurred at the end of one of her shifts. She testified that she used a self-checkout register because that was all that was open at that time of day, and that she typically purchased food or household items during or at the end of her shifts.

¶ 15   The defendant testified that when she was confronted about the videos, she offered to pay for anything that she might have "overlooked." She testified that at the self-checkout registers there was "an audible sound when you scan an item," and that if she ever did not hear that "ding," she would "respond by rescanning" the item. She testified that she did not "intentionally scan something, not hear a ding and then put it in [her] bag," and that she did not "intentionally skip scan items in order to pay less for food at Walmart."

¶ 16   On cross-examination, the defendant testified that she attempted to tilt the bananas toward the scanner, and when that did not work, she removed the sticker from the bananas, scanned it, and placed the bananas on the scale to be weighed. She agreed that she did so because she did not hear a ding when she tried to scan them the first time, which told her they had not been properly scanned. The defendant testified that she believed she heard a ding for the first two fruit drinks and for every other item she ever tried to scan at Walmart. The State described various items it believed the defendant had not scanned and paid for, and the defendant testified, with regard to each item, that she either scanned or manually entered the information about those items, and that she heard a ding for each item she scanned.

¶ 17   Following the defendant's testimony, the defense rested. In closing argument, the State contended the defendant knew what she was doing, and she did not mistakenly fail to pay for the items in question, but intentionally failed to scan them. The State pointed out that even with no

7

audio in the videos, it was possible to tell if an item was scanned because, as Wright testified, the monitor would turn "black *** for a quick second" then a white square would appear. The State again played the video of the three fruit drinks and the bananas, arguing that nothing changed on the monitor when the defendant moved the first two drinks near the scanner in an "attempt scan," but that the monitor did change after the third drink was actually scanned. The State argued that the care the defendant took with the bananas "tells you that she does pay attention," despite the defendant's statements that she did not. The State played the additional videos again and argued that they also showed that the defendant's conduct was intentional and was meant to deprive Walmart of its merchandise.

¶ 18    The defense argued that the defendant did not intend to steal anything, and that if the defendant was trying to steal, she would not have scanned "the first Chobani yogurt and then not scan[ned] the second Chobani yogurt with the Walmart employee standing two feet away from her." The defense further argued that even if the defendant was not as careful as she should have been when using the self-checkout registers, her overall behavior as seen in the videos was "not someone who's trying to skirt responsibility," as witnessed by the fact that she offered to pay for anything that did not scan correctly. With regard to the banana incident for which the defendant was actually charged, the defense argued that the incident happened after a 12-hour work shift, and that there was "reasonable doubt that she scanned three items in without thinking, didn't notice the two didn't scan."

¶ 19    Following deliberations, the jury found the defendant guilty of retail theft. On March 7, 2025, the defendant filed a motion for acquittal, or in the alternative, for a new trial. The motion set forth several general grounds of alleged error, but did not discuss Juror 113, or any other specific juror, at all. No analysis of the alleged errors was included in the motion.

¶ 20    On March 14, 2025, a sentencing hearing was held. No changes or amendments were requested to the presentence report. The State declined to present evidence in aggravation, and the defense declined to present evidence in mitigation. In argument, the State contended that court supervision was not appropriate in this case. The State began to explain its reasoning, but the trial court interrupted, stating that it believed the defendant was not eligible for court supervision pursuant to the statute in question because the defendant did not plead guilty or stipulate to the facts supporting the charge. Defense counsel then pointed out that the defendant's posttrial motion had not been ruled on. Brief arguments were presented on the motion. Defense counsel argued that the evidence was insufficient for a rational jury to find the State had proven the defendant guilty beyond a reasonable doubt. The trial court found that the evidence was sufficient for a reasonable fact-finder to find the defendant guilty beyond a reasonable doubt depending on how they interpreted the video and the testimony. The trial court denied the motion.

¶ 21    Returning to the issue of sentencing options, the trial court stated that it believed its only options were a jail term, probation, conditional discharge, or a fine, but that the court would "listen to argument" with regard to the availability of court supervision. Defense counsel argued that court supervision was available, and that it was the appropriate option "[g]iven the nature of the charges, [the defendant's] lack of any notable criminal record and no indication that she would *** re-offend." Defense counsel stated that if the court decided supervision was not available as an option, the defense would "ask for conditional discharge at the minimum amount of time." The State resumed its argument that supervision was not appropriate, stating that it believed the defendant was at risk of re-offending because the defendant did not take responsibility for the theft and continued to claim it was a mistake, even after seeing the videos. The State recommended "12

9

months of probation and 100 hours of public service work." The defendant made a statement to the court wherein she denied stealing any items.

¶ 22   The trial court again stated that it believed court supervision was not an option, because the relevant statute was "pretty clear on its face." The court stated that it did not "believe a period of probation" was necessary, because the defendant was 58 years old "and her entire criminal history consist[ed] of traffic violations." The court stated it believed "the most appropriate disposition [was] a sentence of conditional discharge for three months and an order to perform 25 hours of public service work and pay all of the mandated statutory fines, fees and assessments." Also on March 14, 2025, the trial court entered a written sentencing order that was consistent with the court's oral pronouncement. This timely appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24   On appeal, the defendant contends her conviction must be reversed because she received ineffective assistance of trial counsel when her counsel failed to further question Juror 113 after that juror indicated bias regarding police testimony. To succeed on a claim of ineffective assistance of trial counsel, a defendant must demonstrate that: (1) defense counsel's performance was so seriously deficient that it fell below an objective standard of reasonableness under the circumstances of the case, and (2) defense counsel's deficient performance so prejudiced the defendant that the defendant did not receive a fair trial. See, *e.g.*, *People v. Ryder*, 2019 IL App (5th) 160027, ¶ 36. This court's scrutiny of counsel's performance is highly deferential, and requires a defendant to overcome the strong presumption that the challenged actions of counsel were the result of sound trial strategy. *Ryder*, 2019 IL App (5th) 160027, ¶ 36. In addition, the conduct of *voir dire* by defense counsel involves matters of trial strategy that are not, in general, subject to scrutiny under an ineffective assistance of counsel claim. *Ryder*, 2019 IL App (5th)

10

160027, ¶ 36. As this court has recognized, "[a]ttorneys consider many factors in making their decisions about which jurors to challenge and which jurors to accept," which is why "reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable." *People v. Jones*, 2012 IL App (2d) 110346, ¶ 71. As the State notes, the demeanor of a prospective juror is a valid factor for counsel to consider when selecting a jury. See, *e.g.*, *People v. Young*, 128 Ill. 2d 1, 20 (1989). It is also well established that persons present in the courtroom are in a superior position to assess demeanor, because a reviewing court does not have "the full benefit of hearing and observing" the individuals involved in the courtroom proceedings. *People v. Morgan*, 2025 IL 130626, ¶ 21.

¶ 25    The defendant notes that the prospective jurors in this case were told by the trial court that part of their job was "to weigh the credibility of each of the witnesses," and were asked if they could "give the testimony of a police officer the same consideration as the testimony of any other witness." Although the first juror to be questioned answered, "Yes," the second juror to be questioned—Juror 113—answered, "No." Thereafter, all 12 of the remaining prospective jurors answered "Yes." No additional questioning of Juror 113 with regard to that juror's response was conducted, either by the trial court or by the parties. The defendant contends that under these circumstances, defense counsel's performance was objectively unreasonable, particularly in light of the fact that the State's case against the defendant "was supported by officer testimony." The defendant argues that as a result of defense counsel's lack of follow-up questioning, "it is impossible to definitively say that Juror 113 was not biased in favor of police officer testimony and, as such, gave improper weight to Deputy Willmore's testimony and Loss Prevention Officer Anthony Wright's testimony." The defendant further argues that defense "counsel's failure to

11

investigate a clear statement of bias from a prospective juror, as occurred with Juror 113, cannot be considered a strategic decision."

¶ 26 We do not agree. As the parties note, it is not possible to determine with certainty whether the bias indicated by Juror 113 was a bias in favor of the testimony of police officers or a bias against it. There is some indicia that it was not a bias against the testimony of police officers, and therefore must have been a bias in favor of their testimony, because Juror 113 did not answer affirmatively when the State asked the entire venire of prospective jurors if any of them had

"had any interaction with the police or [State's Attorney's] office, whether it's a traffic stop, a ticket or being a victim of a crime or being accused of a crime either through your interaction with the police or [State's Attorney's] office, that it was so bad that it still kind of, it's something that you still think about and talk to people about that left such a bad impression that [you] wouldn't be able to be fair and impartial in this case?"

However, this indicia is not determinative, because a prospective juror could have a bias against the testimony of police officers without personally having had negative experiences that would rise to the level that the prospective juror would feel compelled to answer the above question affirmatively. We are unable to conclude definitively, from the record before us, what the nature of Juror 113's bias was.

¶ 27 We therefore reiterate three key precepts of law, which we find to be determinative under the facts of this case: (1) the conduct of *voir dire* by defense counsel involves matters of trial strategy that are not, in general, subject to scrutiny under an ineffective assistance of counsel claim and that are supported by a strong presumption in counsel's favor (see, *e.g.*, *Ryder*, 2019 IL App (5th) 160027, ¶ 36), (2) the demeanor of a prospective juror is a valid factor for counsel to consider when selecting a jury (see, *e.g.*, *People v. Young*, 128 Ill. 2d 1, 20 (1989)), and (3) persons present

12

in the courtroom are in a superior position to assess demeanor, because a reviewing court does not have "the full benefit of hearing and observing" the individuals involved in the courtroom proceedings. See, *e.g.*, *Morgan*, 2025 IL 130626, ¶ 21. As a reviewing court in this case, we do not have the full benefit of having observed the demeanor of Juror 113, either at the time that juror gave the answer in question, or at any other time during the *voir dire* process.

¶ 28    In light of the foregoing, we do not agree that defense counsel's actions in this case could not have been based on sound trial strategy. We therefore decline to conclude, on the record before us, that defense counsel's performance was so seriously deficient that it fell below an objective standard of reasonableness under the circumstances of this case. See, *e.g.*, *Ryder*, 2019 IL App (5th) 160027, ¶ 36.

¶ 29    Because we have concluded that the defendant has not shown that defense counsel's handling of this issue was objectively unreasonable, and therefore deficient, we need not consider whether the defendant can satisfy the prejudice requirement of a claim of ineffective assistance of trial counsel. See, *e.g.*, *People v. Ransom*, 2024 IL App (4th) 230506, ¶ 49 (failure to satisfy either ineffectiveness requirement precludes a finding of ineffectiveness). We nevertheless note that the Illinois Supreme Court has held that where "the evidence was more than sufficient to prove [the] defendant guilty beyond a reasonable doubt," and where it could not be determined if the bias of the juror in question was directed at the defendant or at the State, the prejudice requirement of a claim of ineffective assistance of trial counsel was not met. *People v. Metcalfe*, 202 Ill. 2d 545, 548-50, 562-63 (2002).

¶ 30    The defendant also challenges her sentence, claiming that the trial court erred when it concluded that she was not eligible for court supervision. The State has filed a confession of error with regard to this issue, wherein the State agrees with the defendant that pursuant to binding

precedent from the Illinois Supreme Court in *People v. Boykin*, 94 Ill. 2d 138 (1983), the defendant was eligible for court supervision in this case and therefore her conviction must be vacated and she must be resentenced. We agree. In *Boykin*, the court examined the same statutory provision that is at issue in this appeal—section 5-6-1(c) of the Unified Code of Corrections (730 ILCS 5/5-6-1(c) (West 2022))—to determine "whether a defendant who has been found guilty of a misdemeanor offense following a trial is eligible for supervision under" the statute. 94 Ill. 2d at 140. The *Boykin* court analyzed the language of the section, as well as its legislative history, and concluded that the intent of the General Assembly was to codify the pre-1976 commonly-followed practice that allowed a trial court to sentence a defendant to court supervision regardless of whether the defendant entered a guilty plea or was convicted at trial. 94 Ill. 2d at 141-47. Accordingly, a defendant convicted of a misdemeanor is eligible for court supervision following a trial. 94 Ill. 2d at 147. As the State concedes, the trial court in this case was not aware of this fact, and because the trial court's misapprehension of the law arguably influenced the trial court's sentencing decision, the defendant's sentence must be vacated and this cause must be remanded for resentencing. See, *e.g.*, *People v. Eddington*, 77 Ill. 2d 41, 48 (1979).

¶ 31                                III. CONCLUSION

¶ 32    For the foregoing reasons, we affirm the defendant's conviction for retail theft but we vacate her sentence and remand for resentencing.


¶ 33    Conviction affirmed; sentence vacated and cause remanded for resentencing.

14